# **Exhibit 2**

<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   XPED LLC,                         )
                                       )
 4               Plaintiff,            )
                                       )
 5          vs.                        )  No. 21 C 6237
                                       )
 6   THE ENTITIES LISTED ON            )  Chicago, Illinois
     EXHIBIT 1,                        )  January 18, 2022
 7                                     )  9:03 a.m.
                 Defendants.           )
 8

 9      TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS AND MOTION
                               HEARING
10
                  BEFORE THE HONORABLE ANDREA R. WOOD
11

12   APPEARANCES:

13   For the Plaintiff:      PMJ PLLC
                             BY:  MR. PATRICK M. JONES
14                                MS. SARAH BEAUJOUR
                             900 South Clark Street, Suite 2101
15                           Chicago, Illinois 60606
                             (312) 255-7976
16                           Pmj@patjonesPLLC.com

17   For the Defendant
     RJITSCT d/b/a
18   Respect the Look:       ZUBER LAWLER LLP
                             BY:  MR. BRIAN J. BECK
19                           135 South LaSalle Street, Suite 4250
                             Chicago, Illinois 60603
20                           (312) 767-6060
                             Bbeck@zuberlawler.com
21
     Also Present:  Mr. Reginald Jennings
22
     Court Reporter:          Brenda S. Tannehill, CSR, RPR, CRR
23                           Official Court Reporter
                             219 South Dearborn Street, Suite 1928
24                           Chicago, Illinois 60604
                             (312) 554-8931
25                           brenda_tannehill@ilnd.uscourts.gov
</pre>

1          (Proceedings held remotely, via telephone:)

2          THE COURT:  Good morning.  This is Judge Wood.  I

3    believe we are ready to call the first case, so I will ask my

4    courtroom deputy to call the case, and then we'll get

5    appearances starting with plaintiff's counsel first.

6          David.

7          THE CLERK:  21 C 6237, Xped, LLC v. The Entities

8    Listed on Exhibit 1, for status and motion hearing.

9          MR. JONES:  Good morning, Your Honor.  Patrick Jones

10   on behalf of the plaintiff.  Also with me, although I think

11   her microphone is not working, is Sarah Beaujour.

12         MR. BECK:  Good morning, Your Honor.  This is

13   Brian Beck representing defendant RJITSCT, LLC doing business

14   as Respect the Look.  And with me is the owner of RJITSCT,

15   Reginald Jennings, if the Court wishes to speak to him about

16   the harm being done to his company by the TRO.

17         THE COURT:  Okay.  Thank you, Mr. Beck.

18         Do we have any other counsel or other representatives

19   on the line on behalf of any of the other defendants in this

20   action?  If we do, this would be the opportunity for you to

21   speak up.

22         MR. BECK:  Your Honor, this is Brian Beck.  I don't

23   represent any other defendants, but we filed a motion for

24   leave to file a supplemental last night with the service email

25   that my client received, and it doesn't provide any

1    notification of this hearing.  So we actually -- so it's

2    possible that none of the other defendants even knew that this

3    hearing was going on.

4          THE COURT:  Yes, I did see the supplement that you

5    filed yesterday.

6          Mr. Jones, did you have any reason to believe that

7    any of the other defendants were intending to appear today?

8          MR. JONES:  No.  We've had ongoing settlement

9    discussions and we've settled with many of them, but none of

10   them have expressed an intention to appear today.

11         THE COURT:  And there was a flurry of filings over

12   the holiday weekend, including a reply that was filed on

13   behalf of your client, Mr. Jones, in which after seeking to

14   continue the preliminary injunction hearing, you then in the

15   reply sort of suggest, I think, that you might be prepared to

16   go forward.

17         Just so that I'm clear as to what you're asking for,

18   what is your position?  Are you seeking to have a preliminary

19   injunction entered today against all of the defendants other

20   than Respect the Look?

21         MR. JONES:  That's correct, Your Honor.

22         THE COURT:  And what about this notice issue?

23         It seems to me that there's some group of defendants

24   that didn't receive notice of the lawsuit at all until Sunday.

25   Is that correct?

1        MR. JONES:  That's correct.  The PayPal defendants,

2   including RJITSCT, did not receive notice of the lawsuit until

3   Sunday.

4        All the other defendants except the Alibaba

5   defendants who we have not received contact information for,

6   but all of the other defendants did receive notice of the

7   lawsuit and the preliminary injunction on January 10th.

8        THE COURT:  How many Alibaba defendants are there, as

9   you are calling them?

10       MR. JONES:  14.

11       THE COURT:  13?

12       MR. JONES:  14.

13       THE COURT:  And how many PayPal defendants are there?

14       MR. JONES:  Oh, I believe 88.

15       THE COURT:  So you believe it would be adequate

16  notice to the PayPal defendants, given that there hasn't even

17  been one business day, because, of course, yesterday was a

18  court holiday which wouldn't count, and they were served on a

19  Sunday?

20       MR. JONES:  Right.  And yes, I understand your

21  concern, Your Honor, and that's why we requested an extension

22  of time, because we do want to provide adequate service and

23  due process to these defendants.  And if Your Honor believes

24  it's required, then we're happy to extend this seven days and

25  give them full notice of the -- well, they've already received

1    copies of the complaint and the exhibits and the preliminary

2    injunction but to give them adequate time to respond and

3    notice of the hearing.  That's totally fine with us.  We're

4    not fighting that battle.

5              THE COURT:  Was the notice that was provided to the

6    defendants substantively the same as what was attached as

7    Exhibit 1 to Respect the Look's supplemental filing?

8              MR. JONES:  Yes, I believe so.  Yeah.

9              THE COURT:  So you didn't actually provide notice to

10   the defendants that there would be a hearing on the

11   preliminary injunction; is that correct?

12             MR. JONES:  That's correct.  That's correct, yes.

13             THE COURT:  So I will say that under circumstances,

14   it would seem to me, that none of the defendants were provided

15   with notice that there would be a preliminary injunction

16   hearing today and given that a substantial number -- it sounds

17   like 88 plus 13, so we're talking about 101 -- of the

18   defendants have had less than a business day's notice of the

19   lawsuit altogether that the requirement of Rule 65 -- it's not

20   my requirement; it's Rule 65's requirement -- hasn't been

21   satisfied here of the defendants having adequate notice prior

22   to the entry of a preliminary injunction.

23             Now, the difficulty is, of course, Rule 65 also

24   doesn't explicitly provide for any further extension of an

25   ex parte TRO even if there's good cause unless there's a

6

1    consent by the defendants.

2            What is the argument for why I should extend the TRO

3    for an additional seven days, and how can I do that consistent

4    with Rule 65?

5            MR. JONES:  Right.

6            We initially served the TRO on the platforms, eBay,

7    Amazon, PayPal, et cetera, on January 2nd, and we gave them --

8    immediately gave them authority to provide our contact

9    information and copies of the complaint at that time.

10           So service was effectively provided to all

11   defendants, including the PayPal defendants, and including the

12   objecting party, RJITSCT, who stated in their own objection

13   that they had service of this complaint from PayPal over a

14   week ago.

15           So I think, based on that, the Court could find good

16   cause to extend and also that we served all of the other

17   defendants other than the PayPal defendants and the Alibaba

18   defendants who we couldn't serve because they didn't provide

19   the identifying information in violation of the TRO.  We have

20   not been able to serve them not due to any fault of our own or

21   any lack of effort, but they just will not provide that

22   information.  And we're still working with them.  We've

23   exchanged emails today.

24           So based on those factors, I think the Court can

25   issue the PI with respect to the non-PayPal and the

1   non-Alibaba defendants today and then extend or continue this

2   hearing for one week with respect to those defendants.

3          MR. BECK:  Your Honor, this is Brian Beck.  If I may

4   respond to what Mr. Jones stated about service on RJITSCT?

5          THE COURT:  Okay, go ahead.

6          MR. BECK:  So Mr. Jones states that we admitted that

7   we were served with the complaint on January 7th.  That's not

8   true.

9          What PayPal provided to our client on January 7th was

10  a case number without any identification of what court this

11  case was proceeding in and plaintiff's counsel's email

12  address.  We did not receive a copy of the complaint, summons,

13  TRO, or even any idea of what the legal claim was against

14  Respect the Look.

15         It wasn't until Tuesday that Respect the Look first

16  contacted me.  We weren't retained until Wednesday, the 12th.

17  At that date, I was able to independently investigate, and

18  based on my educated guess as to this type of case and the

19  case number that PayPal provided was a civil case number in

20  this court, I was able to look up the docket on PACER and

21  discover this hearing -- I still wasn't able to pull up the

22  full details of the complaint because most of the important

23  documents and any pertinent evidence against our client was

24  all filed under seal.

25         So we didn't receive any of that evidence until

1    Thursday, the 13th, at which point we diligently worked

2    through the night to get our counterclaim and response on file

3    by Friday, the 14th.

4            So it certainly is not true that we were served in a

5    way that satisfies the requirements of Rule 4 or Rule 65 on

6    January 7th.

7            THE COURT:  Okay.  Thank you, Mr. Beck.

8            Before I talk more specifically about -- well,

9    actually, maybe I will use this as an opportunity because I

10   think my next question, although it's specific with respect to

11   Respect the Look, I think it leads to some questions I have

12   about the defendants as a whole and the filings.

13           So Mr. Jones, your reply that was filed yesterday at

14   Docket 40 where you explained what you've done to serve the

15   defendants, among other things, and you sort of modify your

16   position with respect to what you're seeking today includes

17   two screen shots that I understand to relate to your claim

18   against Respect the Look.  And the first screen shot which is

19   on Page 2 of the filing I understand to be your client's

20   product, FLAGWIX.  And the second screen shot which you refer

21   to as opposing parties', quote, "noninfringing product"

22   appears to belong to Respect the Look, that that's Respect the

23   Look's ad.

24           MR. JONES:  Right.

25           THE COURT:  And then you say, "If this is not

1    counterfeiting, nothing is," but there's no argument or

2    explanation.

3          In what way do you believe that the screen shot of

4    Respect the Look's product demonstrates infringement on your

5    client's trademark?

6          MR. JONES:  So the FLAGWIX trademark has been

7    registered by the plaintiff, and it's used on their flags.  If

8    you purchase a flag from flagwix.com, it will have the FLAGWIX

9    trademark printed on it, and the design that they use is

10   unique to them.  They created it.

11         And then as you can see from the images, defendants

12   like RJITSCT have just completely cut and pasted the image of

13   my client's product onto their website and then they've --

14   there are -- we could go into this more if we're allowed to

15   file a response to their opposition, but they basically clone

16   the images of clients like mine.  They send it to a

17   manufacturer in Xinxiang, China, and then they buy those

18   products and then resell them as if they had actually created

19   those products.

20         THE COURT:  But I don't see anything in the screen

21   shot to suggest that they're using the FLAGWIX name.  Does the

22   word "FLAGWIX" appear in Respect the Look's advertisement?

23         MR. JONES:  Not on this image, but I believe we can

24   find others that do.

25         They're one of the -- Respect the Look is one of the

1    most sophisticated infringers in this case and one of the most

2    widespread.  They Photoshop out the FLAGWIX logo on their

3    images.  So that's a question of fact that we'd have to prove

4    at trial, but that's what they do.  They know better than to

5    just post an image with an infringed logo.

6         THE COURT:  But if they're not using the trademark,

7    how are they infringing on the trademark?

8         MR. JONES:  Because they're using the exact same

9    image.  They're just showing the other side of the flag that

10   doesn't show the trademark.

11        THE COURT:  Do you have a copyright over the design

12   of the flag?

13        MR. JONES:  Yes, common law.

14        THE COURT:  But you haven't asserted in your motion

15   for preliminary injunctive relief that it should be based on a

16   likelihood of success on the merits of a common law copyright

17   claim.  You've asserted it based on the trademark for FLAGWIX,

18   correct?

19        MR. JONES:  Correct, but they cannot avoid an

20   infringement claim just because they've erased the logo.

21        THE COURT:  Well, but I suppose I'm not quite

22   understanding you because if the infringement is of the

23   trademark and they erase the trademark, what is it that you

24   are -- because your brief focuses on the use of the mark, and

25   the mark is identified in your complaint and your moving

1    papers as being "FLAGWIX."  And, in fact, when I went back to

2    look at the papers in support of the TRO to remind myself of

3    what was said there, it's represented that the FLAGWIX mark is

4    used on the website, but this website doesn't appear to use

5    the FLAGWIX mark; it appears -- what you're saying is that

6    there's some sort of design copyright as you're explaining it

7    under the common law that they've infringed, but that's not

8    what your motion papers are based on.

9          MR. JONES:  Well, you can see, Your Honor, that it's

10   the exact same image.

11         THE COURT:  But how do I know that it's not your

12   client that's copying their image if no one has a copyright

13   and nobody's laid forth any facts or evidence to establish any

14   common law copyright?

15         MR. JONES:  Right.  And that's what we'll present if

16   we're given an opportunity to respond to their opposition.

17         It's very clear to my client that this is their

18   product, this is their design, this is their trademark that's

19   been violated; and there are images that the opposing party

20   copied in order to create their product that had the FLAGWIX

21   logo on them.

22         So if we're allowed to respond, I think we can

23   provide that additional information which I agree, that will

24   (audio interference) the question of fact at this point.

25         THE COURT:  Your complaint does not contain a common

1   law copyright cause of action.  It has federal trademark

2   infringement and counterfeiting, unfair competition and false

3   designation of origin, and the Illinois Uniform Deceptive

4   Trade Practices Act, but the only one of those causes of

5   action that you go through the analysis on in your moving

6   papers is the trademark infringement and counterfeiting claim.

7   So how can you, at this stage, base your request for a

8   preliminary injunction on common law copyright when it's not

9   alleged in your complaint?

10          MR. JONES:  That's not what we're basing it on,

11  Your Honor.  We're basing it on trademark.

12          THE COURT:  So if I went through the individual

13  defendants named in this action, how many of them actually use

14  the word "FLAGWIX" in their website or on the product?

15          MR. JONES:  Right.  The number -- I think the number

16  is about 50 percent of them did not remove the FLAGWIX logo,

17  50 percent of them did.

18          The more sophisticated counterfeiters like RJITSCT,

19  you know, they know better than to show the FLAGWIX trademark,

20  but most -- well, about half of them didn't even bother to do

21  that.

22          This defendant who's opposing the injunction didn't

23  even bother to change the name of the product.  They just

24  presented it as the same name, same image, same product.

25          THE COURT:  But am I correct that your client doesn't

1     have a trademark over the name that's used, correct?  Your

2     trademark is FLAGWIX?

3             MR. JONES:  Right.

4             THE COURT:  Okay.  So --

5             MR. JONES:  I'm just presenting that as evidence that

6     they simply copy and paste our product onto their website and

7     then they bought it.

8             And again, this can be explained better if we're

9     allowed to respond to their opposition, but they just cut and

10     paste images and then they buy that product from a

11     manufacturer in Xinxiang, China, and sell it as if they

12     actually created the product, as if it's actually a FLAGWIX

13     product.

14             THE COURT:  Okay.  I'd also like to ask a question

15     about the basis for your claim that the asset restraint or

16     freezing the account for Respect the Look, in particular, is

17     necessary here because your original ex parte motion for a

18     temporary restraining order bases the need for that

19     extraordinary remedy on the likelihood that Respect the Look

20     and the other defendants -- but for the moment, I'll focus on

21     Respect the Look -- is going to move the money in those

22     accounts overseas.

23             Now, Mr. Beck and his client have presented evidence

24     indicating that they're not an overseas-based company, they're

25     not based in China; they have a location and are registered to

1   do business in the State of Connecticut.

2          MR. JONES:  That's not true, Your Honor.

3          THE COURT:  What part of that's not true?

4          MR. JONES:  They have no basis in the United States.

5   The address that they've provided is a PO box.

6          MR. BECK:  Your Honor, --

7          THE COURT:  Just a moment, Mr. Beck.  Let me hear

8   from Mr. Jones, and I'll give you a chance to explain.

9          So Mr. Jones, explain to me the basis for your

10   concern that this defendant, in particular, would take the

11   ill-gotten gains from the purported trademark infringement and

12   transfer it overseas if they weren't restrained from doing so.

13          MR. JONES:  Right.  So they're based -- I'm not

14   really sure.  They used a false name on their PayPal website.

15   Apparently, they are -- they claim to be RJITSCT, LLC, but

16   when you look up their supposed place of business on Google,

17   it's a PO box.

18          They have no presence in the United States.  They're

19   a foreign entity owned by somebody called Reginald Jennings.

20   I don't know who that is or where he lives, but this is not,

21   you know, a brick-and-mortar US company.  This is a mailbox.

22          THE COURT:  Okay.  So is your view that they're based

23   overseas?

24          MR. JONES:  We can present --

25          THE COURT:  How does the fact that they're using a PO

1    box establish that they're based overseas?

2         MR. JONES:  I think, you know, given time, given a

3    couple of days, we can track down where they actually are, but

4    they're not domiciled in the United States as the opposing

5    party claims.  That's false.

6         THE COURT:  How do you know that?

7         MR. JONES:  Because yesterday, I did some research

8    and I went on the Internet and I looked at their address, and

9    it's clearly a PO box operated by over 90 different companies.

10        And I'd have to do more research to find out where

11   Reginald Jennings lives, but I don't think he is from Tucson,

12   Arizona, and that he created a fake address just for the

13   purpose of this LLC.

14        THE COURT:  So Mr. Jennings has submitted a

15   declaration in which he states under penalty of perjury that

16   he is a resident of the State of Connecticut.

17        Are you saying you believe that to be false?

18        MR. JONES:  Yes.

19        MR. BECK:  Your Honor, Mr. Jennings is in this

20   courtroom right now.  He'd be willing to go under oath and

21   testify under oath right here, right now that he is a resident

22   of Connecticut and an American citizen.

23        THE COURT:  Yes, I understand he's on the line, and I

24   do -- I am considering the possibility of having him examined,

25   though I think his declaration, which appears to meet the

1   requirements for a declaration to be used in lieu of an

2   affidavit, states that pretty clearly.

3          Okay.  Thank you for answering my questions,

4   Mr. Jones.

5          Mr. Beck, I'll give you a chance now if you'd like to

6   respond to both of the points, the point about whether they've

7   sufficiently presented evidence of trademark infringement

8   based on the use of the image with the trademark purportedly

9   Photoshopped out and the issues regarding Mr. Jennings'

10  residential and citizenship.

11         MR. BECK:  Thank you, Your Honor.

12         First, regarding the allegation of trademark

13  infringement, Your Honor is exactly right, to infringe a

14  trademark, you have to actually use the trademark.

15         The only trademark that plaintiff has pled in this

16  case and presented any evidence of whatsoever is the word

17  "FLAGWIX."

18         Our client does not use the word "FLAGWIX."  Our

19  client has no desire to be associated with the plaintiff or

20  with FLAGWIX.  Our client makes superior products to FLAGWIX.

21         As set forth in Mr. Jennings' declaration, our client

22  contends it is the one that designs the relevant flags and

23  that FLAGWIX is the one that is making the copies.

24         There is some circumstantial evidence that one could

25  find from the respective websites that since Respect the Look

1    has a clear purpose, if you look at Respect the Look's

2    website, it makes flags that are directed toward a specific

3    market.  It's directed toward conservative customers, military

4    customers, and veterans and contains designs of the types such

5    as the "One Nation Under God" flag that the plaintiff

6    presented as evidence.

7         FLAGWIX presents flags of whatever design it thinks

8    is profitable.  Its flag designs are wide ranging and include

9    anything from the "One Nation Under God" flag to Halloween

10   flags with dogs on them to hippy flags.

11        FLAGWIX is the company that is copying designs and

12   getting them manufactured in Xinxiang, if anyone is.  Respect

13   the Look certainly isn't.

14        Mr. Jones has no evidence whatsoever that Respect the

15   Look is a foreign company or that it has ever held any foreign

16   assets.

17        Mr. Jones says that if he's given the opportunity,

18   he'll present evidence of a common law copyright or a common

19   law trademark.  First of all, it shouldn't be offered that

20   opportunity.  It's their obligation to put in their complaint

21   and their moving papers when they seek an ex parte TRO all of

22   the evidence that they are relying on.  And they are not

23   allowed to make up an allegation out of whole cloth, as

24   Mr. Jones now is frankly admitting that he did, and then come

25   back on a reply to try to actually present the evidence to

1    support their case.

2           There is no copyright infringement claim here.  The

3    Copyright Act makes very clear and the Supreme Court has made

4    very clear that you cannot bring a federal copyright

5    infringement lawsuit without a registered copyright.

6    Mr. Jones has admitted now that there is no registered

7    copyright.  Certainly none was provided in the complaint or

8    the moving papers.

9           There's no common law trademark at issue.  I would

10   hope that Mr. Jones would not have the audacity to argue that

11   he has trademark rights to the phrase "One Nation Under God,"

12   the American flag, or an image of Jesus.

13          So there simply is no merit to the plaintiff's claims

14   as to intellectual property infringement of any kind, and they

15   certainly shouldn't be afforded any opportunity to fix their

16   admittedly deficient papers.

17          Now, as to Respect the Look's domicile, Respect the

18   Look uses a mailing address -- it uses a PO box in

19   Mr. Jennings' hometown as a mailing address for obvious

20   reasons.  Lots of companies do that because Mr. Jennings

21   doesn't want to receive all the mail at his home or presumably

22   doesn't want to receive all the mail at his home mailbox.

23          Mr. Jennings lives in New Britain, Connecticut.

24   RJITSCT is the company that is the official registered company

25   that owns the PayPal account and does business as Respect the

1   Look.  It is registered to do business in Connecticut.  It has

2   a mailing address on that business registration that is not a

3   PO box that has a physical address listed on the LLC

4   registration as set forth in our papers.

5        And I note that that is unlike plaintiff Xped or

6   Expeditee or FLAGWIX or whatever it wants to call itself which

7   has no registration to do business in the State of Illinois.

8        I'm very curious if Mr. Jones can tell us what the

9   address is in Chicago where Expeditee makes its principal

10  place of business, which is the only reason that this case

11  which apparently is between a Nevada company and a Connecticut

12  company is being heard in the Northern District of Illinois.

13       So there simply is no basis to -- there is never any

14  basis to enter the TRO against Respect the Look.  There's no

15  evidence, there's no basis to enter a preliminary injunction

16  against Respect the Look.

17       The plaintiff's motion should be denied.  The

18  plaintiff's TRO should be dissolved.  It would dissolve

19  anyway, and there's no good grounds to extend it.  On the

20  motion for sanctions, we would welcome an evidentiary hearing

21  and further briefing on the motion for sanctions because we

22  think the plaintiff should explain why it has conducted itself

23  the way it has in this lawsuit.

24       THE COURT:  Mr. Jones, what is the address of your

25  client's principal place of business in Chicago?

1       MR. JONES:  125 South Clark Street, 17th floor,

2   Chicago, Illinois 60603.

3       THE COURT:  Okay.  So what do you make of the

4   suggestion by Mr. Beck that there's not really either --

5   there's not really an office there, or if there is an office,

6   it's not really the principal place of business and that

7   that's being used just as a way to establish some hook for

8   venue in the Northern District of Illinois?

9       MR. JONES:  I didn't hear that argument, but I

10  believe that the plaintiff gets to choose its venue, and

11  they've chosen -- the plaintiff in this case has chosen

12  Chicago, Illinois.  The defendant certainly sold or made

13  available sales into Chicago, Illinois, and that's why venue

14  is appropriate.

15      THE COURT:  So I believe the argument -- and Mr. Beck

16  can clarify if I misunderstood -- is that your client doesn't

17  actually have its principal place of business in Chicago.

18      I do see that you have alleged in your complaint that

19  the principal place of business is in Chicago.  So

20  extrapolating from those two things, it seems that Mr. Beck is

21  arguing that whatever you're claiming is the principal place

22  of business is not really.  And in his motion papers, I think

23  it's pretty clear that he's suggesting that there was an

24  intent to manufacture a basis for venue because, as argued by

25  Mr. Beck, you or your client feel that this district would be

1  a friendlier venue for the type of claim that you want to

2  bring than Nevada or someplace else.

3          Mr. Beck, am I misunderstanding your argument?

4          MR. BECK:  No, Your Honor, you're not.  And I'd just

5  note that the address that Mr. Jones just gave of 125 South

6  Clark Street, 17th floor is the address for PMJ, PLLC, his law

7  firm, as you can see on the signature block of plaintiff's

8  reply brief and plaintiff's other papers.  It is not the

9  address of Expeditee, LLC, unless plaintiff's counsel and

10 Expeditee are the same company.  I don't believe they are.

11         THE COURT:  Yes, 125 South Clark Street, 17th floor,

12 that does appear to be your firm's address, Mr. Jones.  So

13 does your client share office space with you?

14         MR. JONES:  Yeah, to the extent that they are in the

15 US, yes, that's their address.

16         THE COURT:  Does your client have offices overseas as

17 well?

18         MR. JONES:  Oh, yeah.  Their base is in Hanoi,

19 Vietnam.

20         THE COURT:  And how many employees do they have that

21 work from the 17th floor of 125 South Clark Street?

22         MR. JONES:  Presently, none.

23         THE COURT:  So in what sense is that their principal

24 place of business?

25         MR. JONES:  Because that's where we registered their

1    IP.  So they have those assets there, and we also help them

2    with their bank accounts.  So their US assets are based in

3    Chicago, Illinois.

4              MR. BECK:  Your Honor, that's also not true.

5              Look at the Trademark Registration Certificate that

6    was attached as Exhibit 2 to the complaint.  It lists

7    Expeditee as having a Nevada address.

8              THE COURT:  So how many employees does your client

9    have, Mr. Jones, in Vietnam?  Or was it Hanoi that you said?

10             MR. JONES:  Yes, correct.

11             THE COURT:  How many employees do they have in Hanoi,

12   in Vietnam?

13             MR. JONES:  I'm guessing, but I'd say maybe 12.

14             THE COURT:  Do they have other offices in the

15   United States?

16             MR. JONES:  Like the opposing party, they have PO

17   boxes scattered about, but no, I don't think they have offices

18   with employees.

19             THE COURT:  On a slightly different topic, Mr. Jones,

20   what is the total amount of funds that, to your knowledge,

21   have now been frozen as a result of the ex parte TRO?

22             I'm not limiting that question just to Mr. Beck's

23   client but for all of the defendants that were named in the

24   complaint.

25             MR. JONES:  I would have to add that up, but I'd say

1 | about 100,000.

2 | THE COURT: Okay. So even if I were inclined to

3 | grant a preliminary injunction or to extend the TRO, it would

4 | seem that at a minimum, the bond that your client has posted

5 | of $5,000 would be inadequate to safeguard against the risk of

6 | the injunctive relief being inappropriately granted and the

7 | harm here.

8 | Would you agree that if I were inclined to either

9 | allow an extension of the TRO or grant the preliminary

10 | injunction that it would also be appropriate to require a

11 | larger bond to be deposited?

12 | MR. JONES: Yeah, I think, in the long run, my client

13 | would agree to that. There's no doubt that there's been

14 | infringement in these cases, especially with respect to the

15 | opposing party, so yeah, I think I could convince my client to

16 | increase the amount of the bond.

17 | THE COURT: Well, I would probably just order it, so

18 | you wouldn't have to convince them. It would be a requirement

19 | of extending the relief.

20 | MR. JONES: That would make it easier.

21 | THE COURT: It would make it easier on you for sure.

22 | Let me see what other questions I have here.

23 | So I'm still not quite sure what the basis is for

24 | your belief currently that Respect the Look is actually based

25 | overseas and is not based in Connecticut under the direction

1    of -- I'm sorry -- Reginald Jennings.

2         MR. JONES:  Well, I'm sorry, Your Honor, but we

3    received this opposition on Friday before a holiday weekend,

4    and, you know, we've been doing our research, and that's going

5    to take some more time.

6         Our basis for supposing that Mr. Reginald Jennings

7    and the opposing party, Respect the Look, are overseas is just

8    that all these companies are overseas and they all use PO

9    boxes.

10        THE COURT:  Is there some basis to believe that

11   Respect the Look is directly acting in concert with the other

12   defendants other than, I think, your suggestion that they are

13   using the same supplier in China?

14        MR. JONES:  That would be a better question for

15   Mr. Beck.

16        THE COURT:  Except for Mr. Beck doesn't have the

17   burden of establishing that there's irreparable harm here.

18   That's the plaintiff's obligation, and your basis so far -- so

19   far, the only real basis that you've offered for why the

20   extraordinary remedy of the TRO was necessary was because this

21   type of company which is based overseas is likely to take the

22   money and run and move the money outside the reach of US

23   courts before you could get to final judgment.

24        There is plenty of case law for the proposition that

25   it's not appropriate to enter an asset freeze or some sort of

1    injunctive relief that has the effect of an asset freeze

2    simply to ensure that a defendant has money in order to pay a

3    monetary judgment.

4          The point has to be that you're trying to keep the

5    defendant from taking the ill-gotten gains of their unlawful

6    conduct and moving it out of the reach of the plaintiff and

7    the courts.

8          So what is the basis for your belief that Respect the

9    Look would do that?

10         MR. JONES:  99 percent of these companies, these

11   counterfeiters -- and we've shown you, the Court, the images.

12   It's identical to what they're doing.  They're selling

13   knockoffs of the same image, the same flag, as our plaintiff,

14   and 99 percent of these defendants are overseas companies.

15   And if we're given the opportunity to respond, we can either

16   demonstrate that they are, or we can confirm that they aren't.

17   And that's all we're asking for at this point.

18         THE COURT:  At this point, I appreciate that you're

19   asking for additional time, but at this point, do you have any

20   basis for challenging the representation by Mr. Jennings and

21   his counsel that his company is actually registered to do

22   business in the State of Connecticut and that the business

23   address that's provided there --

24         MR. JONES:  Again, --

25         THE COURT:  -- is brick and mortar?

1    MR. JONES:  -- we received their pleading on Friday

2 afternoon before a holiday weekend, so no, we have not had an

3 opportunity to do enough investigation other than determining

4 that their purported address was false.  Other than that, no,

5 we have not been able to track them down to their specific

6 foreign address, but I think we can.  And we're just asking

7 for time to do that.

8    THE COURT:  And finally, I think, do you have any

9 case law that you can cite for the proposition that it is

10 trademark infringement to take a photograph of a product, to

11 remove the actual image of the registered trademark and then

12 to use that image to sell your own product, that that is

13 trademark infringement?

14    MR. JONES:  Yes, I think we can provide that to the

15 Court.

16    THE COURT:  Can you provide that to the Court by the

17 close of business today?

18    MR. JONES:  We can do our best.  I don't know.

19    THE COURT:  Because, of course, --

20    MR. JONES:  This was all raised on Friday close of

21 business before a holiday weekend, so --

22    THE COURT:  Well, I appreciate that point.  I do,

23 Mr. Jones, but my concern is that this does not appear to be

24 the theory that you argued in your moving papers for the TRO

25 or the preliminary injunction.

1          Those papers, I believe, as a layperson would

2    understand them, just the common reading of them, suggests

3    that you are arguing that the actual trademark which is the

4    word "FLAGWIX" is found either on the products or on the

5    advertisements for the sellers, that the sellers are using.

6          MR. JONES:  Right.

7          THE COURT:  And further, that you personally, as well

8    as your client, went to each of these websites to confirm that

9    they were using that mark which is "FLAGWIX" in their

10   advertisement.

11         But now, it sounds like your theory is a little bit

12   different.  Your theory is actually that the mark isn't in the

13   actual website.

14         MR. JONES:  Not at all, Your Honor.  Not at all.  I'm

15   sorry.

16         The images that we attached to -- I believe it was my

17   declaration, we showed an image of every single infringing

18   website from every defendant, and 50 percent of those showed

19   the FLAGWIX logo, 50 percent had been Photoshopped out.

20         So it's not as though I'm creating a new theory here.

21   It's the same theory.  It's just that some counterfeiters like

22   the opposing party are more sophisticated than others.

23         So with the original complaint, we attached copies of

24   defendant websites that showed them selling identical products

25   just like the opposing party has done but where they forgot to

1  or didn't know to remove the logo.  Those logos are there, and

2  when you order the product, if they actually deliver it, that

3  logo will be there.

4        THE COURT:  Did your client attempt to order the

5  product from any of the individual defendants?

6        MR. JONES:  Yes, we did.

7        THE COURT:  Did you attempt to order the product from

8  Respect the Look?

9        MR. JONES:  No, we didn't.

10        THE COURT:  Mr. Beck, if I went to your client's

11  website and ordered the flag that is depicted in the reply

12  brief from the plaintiff, would it have the FLAGWIX name

13  somewhere on it?

14        MR. BECK:  As far as my client has represented to me,

15  no.  And Mr. Jennings, you could confirm that, I believe.

16        MR. JENNINGS:  That's correct, it would be no, and it

17  actually was shipped form New Britain, Connecticut, where we

18  are based.

19        THE COURT:  Okay.  I think even though we are getting

20  close to the end of the amount of time that I have allocated

21  at the moment for this hearing, it may be useful, since

22  Mr. Jennings is on the line, to get some additional

23  information regarding the nature of his client's operations in

24  Connecticut, particularly given that the extraordinary relief

25  of restraining the assets to this point has been based on the

1   notion that his company is actually located overseas.

2          And I understand that Mr. Jones would like the

3   opportunity to investigate this further, and I suppose I'm

4   proposing to give a little bit of a jump start on that by

5   asking Mr. Jennings a couple of questions just to flesh out a

6   little bit the nature of the operations that his company has

7   in Connecticut.

8          So with that in mind, since Mr. Jennings is on the

9   line, Mr. Beck, I'd like to ask for him to be placed under

10  oath by my court reporter or, actually, by the courtroom

11  deputy since I think David is available on the line, and then

12  I would just ask him some questions about the extent of the

13  business operations.

14         Do you have any objection to that?

15         MR. BECK:  We have no objection to that.

16         THE COURT:  Mr. Jennings, are you there?

17         MR. JENNINGS:  Yes, ma'am, I'm here, Your Honor.

18         THE COURT:  Okay.  My courtroom deputy, David Lynn,

19  is going to place you under oath.

20         David.

21      (Witness sworn.)

22         THE COURT:  Actually, Mr. Beck, if you would like to

23  ask a couple of questions to elicit anything that you think

24  may be useful, I'll give you the opportunity to do that.  And

25  I'll give Mr. Jones an opportunity for a brief

1   cross-examination.  And then if there's anything that I would

2   like to elicit that the parties haven't, I will follow up at

3   that point.

4         That's probably the most fair way to approach the

5   issue unless, of course, you would defer the opportunity to

6   ask questions, Mr. Beck.

7         MR. BECK:  Certainly, Your Honor.  I can ask a few

8   questions to set the stage.

9         THE COURT:  Okay.  You may proceed.

10        REGINALD JENNINGS, DEFENDANT'S WITNESS, SWORN

11                  DIRECT EXAMINATION

12  BY MR. BECK:

13  Q.  Mr. Jennings, what kind of business is Respect the Look?

14  A.  Respect the Look is an apparel merchant.  We do a lot of

15  what we call print-on-demand items.

16        So myself along with my wife, my sister, and we have

17  a few local people here in the city that we work with, we

18  actually design concepts.  And then we work with not only

19  providing the experience to our customers but also providing

20  jobs back to American citizens.  We do use, in some cases,

21  suppliers right in Detroit -- and I can give you their actual

22  address -- to actually help facilitate some of our actual

23  orders.

24        But Respect the Look is basically a website where you

25  can go in and find things to express how you're feeling,

1    exactly what you've been through, things that you believe in.

2    And we believe everybody deserves that right to be able to

3    express those things, you know, in a safe and a friendly

4    manner.

5    Q.  How many people does Respect the Look have working for it

6    either as employees or contractors?

7    A.  Yes, sir.  So it's around anywhere between 10 to 15 in

8    house, meaning actually at our location.  We have about five.

9    And then we have some in Vermont, we have some in Ohio, we

10   have some in Maryland that also contract and assist us with

11   tasks that we need.

12   Q.  Do you have a physical address in the United States?

13   A.  Yes, sir, I do.

14   Q.  What is that address?

15   A.  It's One Columbia Street, New Britain, Connecticut 06052.

16   Q.  Do you have any financial assets located in a foreign bank

17   account?

18   A.  No, sir.

19   Q.  How much money do you have in the PayPal account that was

20   frozen under the TRO?

21   A.  $283,000.

22   Q.  And what do you use the money in the PayPal account for?

23   A.  Yes, sir.  It's our actual operating expenses, operating

24   fund to actually help our expenses, to pay employees, vendors,

25   also fund advertisement.

1       We actually have to run ads to get customers to buy.

2  It also allows us -- it's also funds from our consultant

3  business and coaching business.  So the 283,000 is from

4  multiple businesses that RJITSCT actually conducts business

5  with in Connecticut.  So it's not just our E-commerce

6  business.

7  Q.  Can you describe the consulting and contracting

8  businesses?

9  A.  Yes, sir.

10      So actually, on Instagram and on Facebook, you can

11 actually go and see that we actually have quite a bit of

12 students that we actually teach how to actually manage their

13 online business and actually help them with their marketing.

14      I also run an IT business.  I actually have run my IT

15 business for the last six, seven years.  I have about ten

16 clients scattered throughout the US that we actually do remote

17 services for.  And during COVID, honestly, that kind of

18 exploded a bit because of the need of working remote.  So we

19 actually do a lot of remote IT services and work with their

20 needs and anything related to technology.

21 Q.  How has the TRO affected the contracting and consulting

22 businesses?

23 A.  Well, to be honest, honestly, I never thought something

24 like this could happen.

25      You know, coming back from vacation with my family

1    after celebrating an amazing year, working was hard, you know,

2    going into the coaching business, going into our coaching

3    business, it has affected us because we're unable to pay our

4    actual vendors, we're unable to pay our staff, unable to

5    receive any payments from our customers.

6            So normally, we would generate quite a bit of sales

7    the end of the year and to now, and honestly, it has been cut,

8    has been cut dramatically, drastically.  And it has affected

9    my ability to even pay taxes today because quarterly taxes are

10   due.

11           I had to borrow money out of my savings to actually

12   pay the credit card bills and kind of get money into our

13   actual employees' pockets so they can pay their mortgages and

14   feed their families.

15           It has also affected my ability to plan.  I can't

16   plan exactly what our next move is because I'm not sure of

17   exactly what the next steps are going to lead to, and, you

18   know, just ultimately just halts our entire business.

19           I have my wife with me right now.  She's not sure

20   exactly if we're going to be able to pay our mortgage next

21   month, you know, what is our plan.

22           Our kids are in school so we don't want them to see

23   it, but they know something's wrong.  And honestly, just like

24   I explained to you before, Mr. Beck, you know, all of this

25   being sealed and not getting any information and not being

1   able to defend ourselves unless we had to go through these

2   extraordinary circumstances has put a really big strain on our

3   family, honestly.  I just want to just disappear because I'm

4   not sure what's going to happen.

5           What I mean by "disappear" is just, like, shut down

6   because honestly, the stress of letting everybody go and

7   telling them, "Hey, we're not sure exactly what we're going to

8   be able to conduct business on" is rough.  And I've never been

9   through something like that before or something like this

10  before.

11  Q.   Certainly.

12          Plaintiffs have accused you of infringing a "One

13  Nation Under God" flag.  Who created the design for the "One

14  Nation Under God" flag that's sold on your website?

15  A.   We did.

16  Q.   And is that the only flag that Respect the Look sells?

17  A.   No, sir.

18  Q.   About what percentage of Respect the Look sales comes from

19  that flag?

20  A.   .0001.

21  Q.   Last question.

22          If the Court enters a preliminary injunction which

23  freezes your PayPal account for months until a full trial is

24  heard on the merits, how will that affect your businesses?

25  A.   I would have to find a job.  I would have to let everybody

1    go.  Honestly, I'm not sure exactly what we would do.

2          My wife who has been a domestic engineer to my girls,

3    two girls, would have to also go back to work as well so that

4    we can get on track.

5          So it would dramatically change our lifestyle.  It

6    would dramatically change exactly what we've worked so hard

7    for, and it will put us, you know, back in the system where

8    everybody else is trying to fight for jobs.

9          MR. BECK:  Thank you, Mr. Jennings.  No further

10   questions for now.

11         THE COURT:  Mr. Jennings, this is Judge Wood.  Just

12   very briefly, where are you calling in to this court hearing

13   from?

14         THE WITNESS:  My personal cell phone.

15         THE COURT:  And what city and state are you located

16   in?

17         THE WITNESS:  Yes, ma'am.  New Britain, Connecticut.

18         THE COURT:  Thank you.

19         Okay.  Mr. Jones, I'll give you an opportunity just

20   on those topics.  Again, this is not intended to be a

21   full-blown preliminary injunction evidentiary hearing but

22   really just to elicit some facts that will help me decide

23   whether there is the sort of circumstance that warrants

24   continuing this relief, so the irreparable harm, for example,

25   and then also this issue of venue -- not so much venue but

1   whether there really is a risk that the sales from any

2   infringement would be moved outside the reach of the Court, in

3   particular.

4          So I'll give you a chance.  Please try to keep it as

5   efficient as possible, but I want to make sure you do have an

6   opportunity to follow up with any questions, Mr. Jones.

7          Would you like a few minutes to do so?

8          MR. JONES:  Yes.  Thank you, Your Honor.

9          THE COURT:  Go ahead.

10                  CROSS-EXAMINATION

11  BY MR. JONES:

12  Q.  So Mr. Jennings, you testified previously that you

13  designed the "One Nation Under God" flag?

14  A.  Yes, sir.

15  Q.  Who did you purchase that flag from?  Who manufactured it?

16  A.  So we actually use a variety of different both local and

17  also international suppliers when it's time to print the

18  designs that we create to keep our costs low and to make it

19  affordable for our customers.

20  Q.  So who supplied that flag?

21  A.  So the supplier for this case, we first started locally,

22  and then, obviously, we use some of our international

23  resources to actually print the concepts that we create.

24  Q.  But specifically, who supplied the "One Nation Under God"

25  flag for your sales?

1  A.  So again, we created our "One Nation Under God," and if we

2  got sales, we would have used a local resource.  We have a

3  company called Custom Flags that does print flags.  And we

4  also have resources just like you said, Alibaba, that can

5  actually print the designs that we actually create.

6  Q.  Do you not know who supplied you with the "One Nation

7  Under God" flag?

8  A.  Again, no one supplied us with the "One Nation Under God"

9  flag.  We designed it, and then we had a third party print it.

10  And then again, we submitted --

11  Q.  Who was the third party?

12  A.  So we use resources like Alibaba, like you mentioned as

13  well.

14        I would have to look up the actual supplier, but the

15  question that you asked was exactly, you know, who supplied

16  us.  No one supplied us with it.  Again, we designed it, and

17  then we had an actual printing company print it out.  And

18  again, --

19        THE COURT:  Mr. Jennings, this is Judge Wood.  Let me

20  jump in in an effort to try to clear things a bit.

21        If I were to go onto your website to order the "One

22  Nation Under God" flag, how would you go about getting one to

23  send to me?

24        THE WITNESS:  Correct.  So what we do, when we start

25  advertising, if we see there's a need, we would go ahead and

1    have our concept to be printed.

2           We use local suppliers first to make sure that

3    everybody is happy with the quality, design, et cetera,

4    et cetera, and then we will buy our items in bulk, have them

5    actually delivered to our location.

6           THE COURT REPORTER:  I'm sorry.  Mr. Jennings, you

7    cut out.

8           THE WITNESS:  So I'm not sure exactly where it went

9    out.

10          If you ordered an item from us right now, we would go

11   and check our inventory down in our actual warehouse here in

12   Connecticut.  If we don't have that product in stock, we would

13   then send an actual order for it to get reprinted either from

14   our domestic suppliers or our overseas suppliers.

15          THE COURT:  Where is your warehouse located?

16          THE WITNESS:  In Connecticut.  One Columbia Street,

17   New Britain, Connecticut.

18          THE COURT:  Any additional questions, Mr. Jones?

19          MR. JONES:  Yes.

20   BY MR. JONES:

21   Q.  Did you ever scan the images from "One Nation Under God"

22   from the flagwix.com website?

23   A.  No, sir.

24   Q.  Then how do you explain how the images are identical?

25   A.  Honestly, when I look at theirs and I look at ours, our

1   actual stripes are different.  Again, we don't own the Jesus

2   face.  And our crosses are different as well.  You know,

3   again, they look very similar.  I can definitely see that as

4   well.

5          And if there was ever an issue from you guys, I would

6   expect you guys to reach out to us, and we obviously would

7   have actually taken it down.

8   Q.  And did you receive -- did you contact PayPal on

9   January 2nd about this problem with your account?

10  A.  We did.  And you know what they told us?  They told us

11  everything was sealed and to reach out to our legal team.

12         And my wife and I then had to scramble to find

13  multiple lawyers to actually figure out if there was a case.

14  No one could actually find the case.  And I was truly thankful

15  that I was able to find Mr. Beck from a referral for these

16  type of cases to then figure out your actual information from

17  PayPal because PayPal would not give us anything.

18         I had to contact first our actual -- our contract

19  lawyer that we use from time to time to actually contact

20  PayPal, and they finally gave us your actual information.  And

21  then from there, we went on a hunt to find Mr. Beck.  But

22  prior to that, --

23  Q.  When did they give you my information?

24  A.  They gave us your information -- I would have to look, but

25  it was, honestly, last week, Monday, Tuesday.  It wasn't that

1    long --

2    Q.   And did you reach out to me?

3    A.   I actually reached out to a lawyer who actually reached

4    out to you, yes, sir.  That's when Mr. Beck got involved.

5            MR. JONES:  Okay.  All right.  I think that's the

6    most we're going to get out of the witness, Your Honor.

7            THE COURT:  Okay.  Thank you, Mr. Jennings.  That was

8    very helpful.

9            THE WITNESS:  Thank you, ma'am.

10           THE COURT:  Here's what I would like to do, because I

11   do have other hearings that were scheduled for this morning,

12   and I also want to make sure that Mr. Jones has some time to

13   pull together any case law that he would like to bring to my

14   attention to support his theory of trademark infringement for

15   the 50 percent or so of the defendants who he believes

16   Photoshopped the name of his client off of a screen shot so

17   that they could then use it both, as I understand it, as a

18   design template for their products as well as an advertising

19   image for their products.

20           So I would like -- and I'm not necessarily at this

21   point asking for additional briefing but more supplemental

22   authority on the specific point.  I would like to have it --

23   let's see, it's 10:00 o'clock now -- I will say by

24   6:00 o'clock this evening.

25           I will also give Mr. Beck the opportunity to submit

1   any authority.

2         Actually, let me take a look.  I may be able to be a

3   little bit more generous with the time given to the parties.

4         Mr. Beck, I know that you've presented some testimony

5   from your client regarding the harm that his business will

6   suffer if the PayPal account remains frozen.  Is there any way

7   that you can quantify for me how much additional harm beyond

8   what he's already suffered he would suffer if the order

9   remained in place until 2:00 p.m. on the 20th, which is

10   Thursday?

11         MR. BECK:  So my client, I believe, is suffering

12   thousands of dollars in lost sales a day.

13         It's hard to estimate, you know, what future sales

14   are or what future lost sales are with a high degree of

15   certainty, but just by comparison, last year, his revenues

16   from last year to his revenues from this year, he has lost

17   thousands of dollars each day.

18         The $5,000 bond plaintiffs have posted certainly has

19   already been exhausted in terms of the additional restraint.

20   An additional two days would still be more than that $5,000,

21   I believe.

22         MR. JONES:  Your Honor, if I can ask, how are they

23   losing sales via their account being frozen?

24         THE COURT:  Good question.

25         Mr. Beck, can't people still buy the flags?  It's

1    just that Mr. Jennings can't transfer the proceeds out of the

2    PayPal account?

3             MR. BECK:  If they choose to use a different merchant

4    service, they could, but many of Mr. Jennings' customers

5    prefer to use PayPal, and if they find out that they can't use

6    PayPal, they won't go ahead with the sale.

7             THE COURT:  Just to be clear, because I think the

8    effect of these orders is sometimes different depending on the

9    platform that's being used for the sales, and so is your

10   understanding that with respect to PayPal, people can't

11   transfer money into the account?

12            MR. BECK:  That's my understanding.  Mr. Jennings can

13   correct me if I'm wrong.

14            THE WITNESS:  Your Honor, basically, our customers

15   prefer to use PayPal.  Just because of the times that we live

16   in with a lot of fraud and everything else, PayPal makes it

17   easier for them to actually conduct business.  And we prefer

18   PayPal.  You know, to answer the question yes, they'll order,

19   but they prefer PayPal.

20            And not just -- our E-commerce business does use

21   PayPal, but all of our other businesses where our customers

22   actually send us transactions, those are PayPal, and

23   everything is frozen right now.

24            THE COURT:  So the reason I ask, Mr. Jennings, is

25   because most often in these cases -- and I'm thinking

1   primarily of the sellers that are using Amazon, but most

2   often, the ability to withdraw funds from the vendor account

3   is suspended, but you can still sell the product and people

4   can still pay for it and it goes into the account.

5           Are you suggesting that that's not how your PayPal

6   account works, that if somebody went to the website and

7   attempted to buy the flag, they would not be able to use

8   PayPal to transfer the funds?

9           THE WITNESS:  They would be able to use PayPal.

10          The problem remains, Your Honor, is we're unable to

11  actually pay our vendors, suppliers, to actually manufacture

12  and produce the products.  We're not even able to run

13  advertisements right now because all the funds are being held

14  up.  So everything has been shut down because our PayPal

15  account, funds within the PayPal account, which is our

16  operating money, is not leaving, it's not moving, is not

17  transferring.  So everything had to halt, Your Honor.

18          THE COURT:  I see.  You're saying if somebody ordered

19  it, you wouldn't be able to go out and purchase the flags

20  because you couldn't get the money?

21          THE WITNESS:  Yes.  We wouldn't be able to purchase,

22  we wouldn't be able to send money to our vendors to produce

23  it, yes, Your Honor.

24          MR. JONES:  Your Honor, this is Patrick Jones.

25          I just purchased a flag right now.

1     THE WITNESS:  Not from us.  My phone didn't go off,

2  and I didn't get a sales record.

3     MR. BECK:  Your Honor, I would submit this is beside

4  the point because plaintiff hasn't shown any good cause under

5  Rule 65 to extend the TRO, and the TRO expires today by its

6  own terms.

7     THE COURT:  Yes.

8     Okay.  So here's what I'm going to do.  As I said,

9  I'm going to give both sides until -- I'll give you until

10  6:00 o'clock today to submit any supplemental authority on the

11  particular points that I mentioned before which, as a

12  reminder, is whether removing the trademark from the image and

13  then using that image constitutes infringement.

14     What I will do is endeavor to issue an order as

15  quickly as possible thereafter in order to address the

16  concerns about the TRO and making sure that timeliness

17  concerns are satisfied.

18     I will set another status hearing for the afternoon

19  of the 20th at 2:00 p.m.

20     I am not suggesting, Mr. Beck, that I'm going to wait

21  until the 20th in order to rule.  To the contrary, I think I

22  have enough information or I may have enough information once

23  I get any legal authority that the parties would like to

24  submit this afternoon.  So that I would expect there will be

25  an order of some sort issued either later this evening or

1    first thing in the morning.

2            Given that a preliminary injunction motion has been

3    filed and proceedings have started on that, I'm going to

4    extend the TRO only until such time as an order can be

5    entered.

6            There are two requests for relief here I'll just note

7    for the record.  One is the request for the preliminary

8    injunction which would supersede the TRO.  There is also the

9    request by this particular defendant to dissolve the TRO as to

10   it, which is a slightly different issue than whether a

11   preliminary injunction should ultimately be entered.

12           It may be that there's grounds for a preliminary

13   injunction to be entered as to other defendants, but the TRO

14   is appropriately dissolved as to this defendant.

15           It might also be that the TRO is dissolved as to this

16   defendant but the parties still conduct preliminary injunction

17   proceedings because, of course, you don't have to have a TRO

18   in order to be entitled to a preliminary injunction.  The

19   analysis takes place at two different points in time.

20           So for present purposes, the status quo will be

21   maintained until I issue a further ruling.  The parties may

22   submit short supplemental authority.  This is not briefing.

23   It can even be just a case citation maybe with a

24   parenthetical.  If you do end up writing something, it should

25   be less than five pages, but again, it could be one page, or

1    you could decide not to submit any supplemental authority on

2    that legal point.

3            I'm going to take under advisement the request for

4    the preliminary injunction until Thursday, and then I'll make

5    a decision on when to set a full preliminary injunction

6    hearing.

7            As I said before, I don't think that that matter is

8    appropriately addressed today as to any of the defendants

9    given that it's unclear that any had full notice that this

10   hearing was taking place other than perhaps Respect the Look

11   which obviously knew about the hearing and participated.

12           My concern is that the other Alibaba and PayPal

13   defendants either haven't had notice at all yet or did not get

14   notice until Sunday so they would not have had even one full

15   business day's notice of the preliminary injunction hearing.

16   Rule 65 is very clear that notice has to be provided before a

17   preliminary injunction can be entered.

18           So I'm going to sort through some of these procedural

19   issues.  I will issue an order after I see if there's any

20   supplemental authority provided by the parties later today,

21   and we will continue the hearing by telephone at 2:00 o'clock

22   on Thursday if Counsel are available.

23           Mr. Jones, are you available then?

24           MR. JONES:  I am available, and we will provide

25   notice to all of the defendants of that hearing.

1          THE COURT:  Okay.  Mr. Beck, are you available then?

2          MR. BECK:  I am available Thursday at 2:00 p.m.

3          I'd just ask that -- I didn't hear -- I guess there's

4  two questions.  One is -- I wasn't clear -- is the TRO

5  dissolved immediately as to Respect the Look?  I heard you say

6  that the TRO was appropriately dissolved as to Respect the

7  Look but that the status quo would be maintained.

8          THE COURT:  No.  And certainly if I said that, I

9  misspoke.  I'm not making a decision on your motion to

10  dissolve the TRO.  I was simply acknowledging for the record

11  that that is a separate request as opposed to the request that

12  there be a preliminary injunction entered and your opposition

13  to that request relating to the preliminary injunction.

14          I have not made a decision on dissolving the TRO.

15  The TRO is still in effect through today.  I am going to

16  consider the arguments from the parties today.  I'm also going

17  to consider any supplemental authority that is provided by

18  6:00 o'clock this evening which should be filed, again, even

19  if it's just a notice of supplemental authority, and I'll

20  enter an appropriate order.  But I have not made a decision on

21  dissolving the TRO.  I will proceed with that as quickly as

22  possible once I've had a chance to consider what I've heard

23  from the parties, the flurry of filings over the weekend, and

24  anything that you submit later today.

25          MR. BECK:  Thank you, Your Honor.

1        And we'd also request a date for a hearing on our

2    motion for sanctions, especially because of this preliminary

3    injunction hearing.  Mr. Jones admitted to a Rule 11 violation

4    by admitting that his client's primary place of business is

5    not Chicago, Illinois.

6        THE COURT:  So here's what I'd like to do.  On the

7    20th, one of the things I'm going to do is set a schedule for

8    resolving the motion for sanctions.

9        Typically, for a motion for sanctions under Rule 11

10   or the Court's inherent authority, I would want to have some

11   sort of evidentiary hearing.  I certainly would not issue any

12   sort of ruling on that without giving the plaintiff a full

13   opportunity to respond.  And that's a response in writing and

14   with evidence.

15       MR. JONES:  I did not admit to that.

16       THE COURT:  So I understand that, Mr. Jones.  I think

17   that's just Mr. Beck's argument and characterization.  On the

18   20th, I'd like to set a schedule for resolving that.

19       There is also a counterclaim that will require an

20   answer within 21 days of when it was served.  I believe the

21   counterclaim was served, let's see, on the 14th, so that would

22   mean the answer to the counterclaim would be due February 4th.

23       By the way, the motion at Docket Number 33 for excess

24   pages is granted.  The other motions are taken under

25   advisement.

1          On the 20th, we'll set a schedule for sanctions

2    proceedings, if appropriate.  And the parties will get an

3    order from me between now and tomorrow morning to address the

4    more emergent issues relating to the continuance of the TRO.

5          MR. BECK:  Brian Beck again.  One last question

6    regarding the deadline for our answer or otherwise respond to

7    the complaint.

8          Since it's very unclear whether or not proper service

9    was effected and what day that service was on, we're not

10   actually sure what the deadline would be for us to respond to

11   the complaint.

12         THE COURT:  What is your position on when your client

13   received notice of the complaint by email service?

14         MR. BECK:  We received a partial complaint by email

15   service on the 16th, so on Sunday.  That service still was not

16   adequate.  It didn't include Exhibit 2, though Mr. Jones had

17   separately provided that to me on another date.  So I believe

18   21 days from the 16th which would go to -- which was the

19   Sunday, so that would go to February 7th, would be reasonable.

20         THE COURT:  And Mr. Jones, when you were calculating

21   service, were you doing it from when this defendant received

22   notice that its account was frozen?

23         MR. JONES:  No, we're not.  We're going to give them

24   the full 21 days from when we actually served the complaint

25   and the summons.

1          THE COURT:  Okay.  So you would agree with the

2   February 7th date?

3          MR. JONES:  Yeah, that's fine.

4          THE COURT:  Okay.  So the answer date for this

5   defendant -- and I'm using the Respect the Look name, but it's

6   RJITSCT, doing business as Respect the Look -- will be

7   February 7th.

8          MR. BECK:  Thank you, Your Honor.

9          THE COURT:  Any other questions, Mr. Beck?

10          MR. BECK:  Not at this moment.

11          THE COURT:  Anything else, Mr. Jones?

12          MR. JONES:  No, Your Honor.  Thank you.

13          THE COURT:  Okay.  Thank you for answering my

14   questions this morning.

15          I believe that's all on this matter.  I know we're

16   running a little bit behind for the other cases on my morning

17   schedule, so my courtroom deputy will check the next couple of

18   cases in and see who we have so we can try to get back on

19   schedule.

20          (Proceedings adjourned at 10:25 a.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4         I, Brenda S. Tannehill, certify that the foregoing is

5   a complete, true, and accurate transcript from the record of

6   proceedings on January 18, 2022, before the HONORABLE

7   ANDREA R. WOOD in the above-entitled matter.

8

9

10  */s/Brenda S. Tannehill, CSR, RPR, CRR*          2/8/2022

11        Official Court Reporter                    Date
          United States District Court
12        Northern District of Illinois
          Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25