UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Xped LLC, | |
|     *Plaintiff*, | |
| v. | |
| The Entities Listed on Exhibit 1, | No. 21 CV 6237 |
|     *Defendants.* | Judge Lindsay C. Jenkins |
| RJITSCT, LLC d/b/a Respect the Look, | |
|     *Counter Claimant,* | |
| v. | |
| Expeditee LLC, | |
|     *Counter Defendant.* | |

MEMORANDUM OPINION AND ORDER

This case is one of many in the Northern District of Illinois's "cottage industry" of "Schedule A" cases. *See BRABUS GmbH v. Individuals Identified on Schedule A Hereto*, 2022 WL 7501046, at *1 (N.D. Ill. Oct. 13, 2022). As of March 2022, over 1,900 such cases had been filed. [Dkt. 79-1 ¶ 3.] These cases often proceed in rote fashion. Plaintiffs allege hundreds of defendants are infringing their trademarks and selling counterfeit goods. Fearing overseas defendants will abscond with ill-gotten gains if served with a lawsuit, plaintiffs seek an *ex parte* temporary restraining order ("TRO") to freeze funds held by online merchants, then follow up with a request for a preliminary injunction. Few defendants appear in court, so plaintiffs move for default judgment and collect what funds they can. *See BRABUS GmbH*, 2022 WL 7501046,

1

at *1. But while some attorneys seem to approach Schedule A cases in a "cut-and-paste" style, *id.*, their professional obligations apply with equal force as in any other litigation.

Plaintiff Expeditee LLC secured an *ex parte* TRO in this Court during the 2021 holiday season, freezing the accounts of hundreds of entities, including Defendant RJITSCT, LLC, doing business as Respect the Look, for alleged trademark infringement and other violations. [Dkt. 20.] After extending the TRO, the Court set a preliminary injunction hearing for January 18, 2022. [Dkt. 24.] Four days before the hearing, Respect the Look appeared [Dkt. 30], brought a counterclaim against Expeditee [Dkt. 31], and moved to dissolve the TRO and for sanctions [Dkt. 34]. Respect the Look's filings and the argument and testimony at the January 18 hearing alerted the Court to serious inaccuracies in Expeditee's filings and problems with the merits of its claims against Respect the Look. The Court dissolved the TRO against Respect the Look [Dkt. 52], and Respect the Look renewed its motion for sanctions under the Court's inherent authority. [Dkt. 78.]

From the outset, this case has been plagued with serious misconduct. While some of the misconduct may have been the result of negligence or honest mistakes, the Court finds that Expeditee, its counsel, or both engaged in bad-faith conduct and committed fraud on the Court. This misconduct demands significant sanctions. Accordingly, the Court grants Respect the Look's motion for sanctions, dismisses Expeditee's claims against it with prejudice, and awards it reasonable attorney's fees and costs.

2

## I. Background

### A. The Complaint

On November 22, 2021, "Xped LLC," through its attorney Patrick M. Jones of the law firm PMJ PLLC, filed a Schedule A complaint against hundreds of Defendants for trademark counterfeiting and infringement, 15 U.S.C. § 1114, unfair competition and false designation of origin, 15 U.S.C. § 1125(a), and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510. [Dkt. 1, *see* Dkt. 2 (list of Defendants).] The trademark infringement claim centered around the FLAGWIX mark, which "Xped" uses as a source indicator for cloth flags. [*See* Dkt. 2-1 (trademark registration).] "Xped" alleged "that Defendants' Counterfeit Products are sold using marks which [are] identical or confusingly similar to the Mark" [Dkt. 1 ¶ 35], and it sought injunctive relief to stop the alleged infringement [*id.* at 9].

Plaintiff's misrepresentations began in its complaint.[1] "Xped LLC" was a pseudonym; its true identity was Expeditee LLC, which it revealed over a month later. [*See* 01/05/2022 Dkt. Entry; Dkt. 77.] Further, Expeditee represented that it was a Nevada LLC with its principal place of business in Chicago [Dkt. 1 ¶ 1.] Both

---

[1]     Because this Order describes serious misconduct by Expeditee and its counsel, the Court pauses to clarify how its references to Plaintiff and its counsel should be interpreted. Arguments and allegations made by "Expeditee" refer to positions taken by the Plaintiff, through former or current counsel, in filings in this Court. Actions taken by Jones describe Jones's conduct in preparing and filing papers on behalf of Expeditee and arguments and representations made on Expeditee's behalf in this litigation. The Court acknowledges that Expeditee initially retained the PMJ law firm, not Jones individually, to represent it. [Dkt. 97 at 1.] The Court refers to former counsel as Jones for clarity and ease of reference only; it does not decide whether the misconduct described in this Order is attributable to the PMJ firm, Jones individually, or both. Finally, arguments made by PMJ appear in PMJ's separate opposition to Respect the Look's motion for sanctions. [Dkt. 97.]

statements were false. Expeditee is a Delaware LLC with its principal place of business in Hanoi, Vietnam. [Dkt. 89-2 ¶ 2.]

### B.    TRO Proceedings

On November 30, 2021, Expeditee moved for an *ex parte* TRO to enjoin the sales of counterfeit products and to freeze the accounts of the Defendants. [Dkt. 11 at 9–10.] To obtain a TRO, Expeditee had to show, among other things, that it had "some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (preliminary injunction context); *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) ("The standards for granting a [TRO] and preliminary injunction are the same." (citations omitted)).

To support its likelihood of success on the merits, Expeditee focused on its trademark infringement claim, which was based on infringement of its FLAGWIX mark. [Dkt. 11 at 15–19.] While it argued it had a likelihood of success on the merits of its other claims, it expressly linked those claims with its trademark infringement claim. [*Id.* at 19–20 ("The Mark is a registered mark, and Plaintiff has established a likelihood of success on the merits of its trademark infringement and counterfeiting claim …, [and therefore] a likelihood of success on the merits for Plaintiff's false designation of origin claim is also established."), 20 (same for state law claim).] Jones declared, under oath, that his client had prepared a list of infringing Defendants and that Jones had authenticated the listings himself. [Dkt. 13 ¶ 5; *see* Dkt. 2.]

Expeditee also argued that it was essential to obtain an *ex parte* order freezing the Defendants' assets:

> Issuing an *ex parte* order will ensure Defendants' compliance. If such an order is not issued in this case, Defendants are likely to disregard their responsibilities and fraudulently transfer financial assets to overseas accounts before an order is issued. Specifically, upon information and belief, the Defendants in this case hold most of their assets in China, making it easy to hide or dispose of assets, which will render an accounting by Plaintiff meaningless.

[*Id.* at 25.] In Jones's declaration, he stated that if the TRO was granted, he would "notify the Defendants by sending copies of Plaintiff's Ex Parte Motion for TRO and supporting papers via e-mail to the e-mail addresses provided by the Defendants to the Websites responsible for hosting their respective Webstores." [Dkt. 13 ¶ 4.]

Thus, both the Defendants' trademark infringement and the likelihood that they would remove any U.S.-based assets overseas if an *ex parte* TRO was not entered were central to Expeditee's request for injunctive relief. Further, Jones declared that Expeditee would serve the Defendants by email if the Court entered the TRO. The Court accepted these representations and entered the TRO on December 21, 2021. [Dkt. 20.] It permitted Expeditee to provide notice to the defendants "by sending an e-mail to the e-mail addresses provided for Defendants by third parties hosting their webstores." [*Id.* at 6–7.] On January 3, 2022, Expeditee moved for a 14-day extension of the TRO, until January 18, 2022. [Dkt. 22.] The Court granted the motion and set a preliminary injunction hearing for January 18, 2022. [Dkt. 24.]

## C. Proceedings Before Preliminary Injunction Hearing

On January 10, 2022, Expeditee moved for a preliminary injunction. [Dkt. 26.] The same day, Jones filed a certificate of service, declaring under penalty of perjury that he "caused to be served true and accurate copies of" the relevant documents "via email on the Defendants …." [Dkt. 28 at 1.] But that was not true. On December 22,

2021, Jones had emailed PayPal, a nonparty to the litigation, "instructing it to provide PMJ's contact information to any defendant whose accounts were affected by the case." [Dkt. 97 Ex. A ¶ 16. *But see id.* Ex. B ("authoriz[ing]," not instructing, PayPal to send the service documents).] Jones "did not dictate or have any control over PayPal's communications to its customers" [*id.* at 9]; Jones did not receive a copy of any communication PayPal sent the Defendants; and PayPal did not confirm to Jones that it had served the Defendants in accordance with the Court's TRO [*cf. id.* (describing the steps Jones took regarding service)]. Despite Jones's lack of control over PayPal and confirmation that PayPal had effected proper service, he "believed that the defendants had been served on January 7 and January 10, 2022" and signed the certificate of service under that belief. [*Id.*]

In fact, PayPal had not sent the Defendants the documents Jones had asked it to. Respect the Look learned in late December 2021 that its PayPal account was frozen, which PayPal said was because of a court order. [Dkt. 35 at 3.] On January 7, 2022, PayPal provided Respect the Look with PMJ's contact information and a case number—"216237," not 21-cv-6237—and advised Respect the Look to contact Jones. [Dkt. 35-6.] On January 12, Respect the Look retained Brian Beck of Zuber Lawler LLP to represent it before this Court. [Dkt. 35-7 ¶¶ 1, 13.] On January 12 and 13, Beck and Jones corresponded, and Beck twice requested a copy of the service email Expeditee had sent. Jones did not provide it. [Dkt. 35-7 ¶¶ 13–15; Dkt. 35-20.] On January 14, Beck entered an appearance on behalf of Respect the Look [Dkt. 30], filed a counterclaim against Expeditee [Dkt. 31], and moved to dissolve the TRO, to oppose

the entry of a preliminary injunction, and for sanctions [Dkt. 34]. Respect the Look identified possible misrepresentations as to Expeditee's identity, its principal place of business, that Respect the Look was using the FLAGWIX mark, and that Respect the Look was likely to abscond with any U.S.-based funds. [Dkt. 35 at 4–8.]

On January 16, Jones filed an amended certificate of service confirming that the "PayPal Defendants" had been properly served and attributing the lack of service by January 10 "to a miscommunication between the Plaintiff and its counsel." [Dkt. 38.] The same day, Jones moved to continue the January 18 preliminary injunction hearing until January 25, 2022. [Dkt. 37.] Respect the Look opposed the motion [Dkt. 39], and the Court ordered that the preliminary injunction hearing would proceed as scheduled on January 18 [Dkt. 41]. Expeditee's reply in support of its motion to continue the hearing labeled Respect the Look as "one of the most sophisticated counterfeiters" Expeditee sued, and it included the following image of a Flagwix flag:



contrasted with a similar Respect the Look flag:



[Dkt. 40 at 2–3.] Expeditee asserted, "If this is not counterfeiting, nothing is." [*Id.* at

3.] A closer look reveals that the two flags are not identical: the stripes run in different

directions, the hands are slightly different, and other elements vary in size and

position. More significantly, the Respect the Look flag does not bear the FLAGWIX

mark, the alleged infringement of which is why Expeditee received the TRO.[2]

---

[2]        Expeditee and PMJ repeatedly characterize Respect the Look's flag as substantially
identical to Expeditee's flag, often suggesting the only difference is that the FLAGWIX mark
has been "cropped" or "blurred" out of the image. [*See, e.g.*, Dkt. 97 at 3 ("identical" but
"cropped"), Ex. A ¶ 11 ("Photoshop, crop or blur"); Dkt. 98 at 2 ("clone"), 8 ("nearly identical"),
12 ("blurred and cropped"), 13 ("intentional blurring").] Unlike other Defendants' flags [*see*
Dkt. 13-2, 13-3, 13-4, 13-5], Respect the Look's flag is not identical to Expeditee's, and it could
not have been produced merely by cropping or blurring the FLAGWIX mark. The Court finds
that arguments to this effect are unsupported, and it declines to address them all at length.

### D. January 18, 2022 Preliminary Injunction Hearing

Respect the Look was the only Defendant to appear at the preliminary injunction hearing, and it remains the only Defendant to have entered an appearance in this litigation. The hearing covered several topics. The Court first addressed the service issue. Jones acknowledged that 88 Defendants that sold products via PayPal and 14 that sold via Alibaba did not receive effective service by January 10 and that the January 16 service did not provide notice of the January 18 preliminary injunction hearing. [Dkt. 66 at 3:23–4:20.] Jones also admitted that neither Expeditee nor Jones served the Defendants by email as of January 10 because he had relied on the nonparty platforms including PayPal to effect service. [*Id.* at 6:5–:11 ("We initially served the TRO on the platforms, … and we … immediately gave them authority to provide our contact information and copies of the complaint at that time. So service was effectively provided to all defendants …."), 6:19–:22 ("We have not been able to serve [the PayPal and Alibaba Defendants] not due to any fault of our own or any lack of effort, but [PayPal and Alibaba] just will not provide that information.").]

Next, the Court addressed Expeditee's representation that if Respect the Look's flag "is not counterfeiting, nothing is." [*Id.* at 8:8–9:5.] Jones asserted that "as you can see from the images, defendants like [Respect the Look] have just completely cut and pasted the image of my client's product onto their website," and that Respect the Look "Photoshop[s] out the FLAGWIX logo on their images." [*Id.* at 9:11–:13, 10:2–:3.] Jones admitted that the image he included in his January 17 filing does not include the FLAGWIX mark, but he asserted "I believe we can find others that do." [*Id.* at 9:23–:24.] When the Court asked how Expeditee could have a trademark

infringement claim if Respect the Look removed the mark, Jones appeared to change his legal theory to a copyright claim. [*Id.* at 10:6–:13.] The Court pressed Jones on this point, noting that Expeditee's TRO application represented that Respect the Look used the FLAGWIX mark. Jones reiterated that Expeditee's TRO was based on a trademark infringement claim, which he believed was valid because Respect the Look used "the exact same image." [*Id.* at 10:14–12:11 ("It's very clear to my client that this is their product, this is their design, this is their trademark that's been violated.").] Jones then clarified that "about 50 percent" of the Defendants' products subject to the TRO did not contain the FLAGWIX mark, allegedly because those Defendants removed the logo. [*Id.* at 12:15–:17.]

The Court then turned to Respect the Look's frozen PayPal account. It noted that Expeditee represented that this "extraordinary remedy" was needed based on the likelihood that Defendants including Respect the Look would move money overseas unless their accounts were frozen, but Respect the Look had introduced evidence showing that it is not an overseas company and instead is based in Connecticut. [*Id.* at 13:14–14:1.] In response, Jones flatly asserted, "That's not true." [*Id.* at 14:2.] His support for that statement was that Respect the Look uses a P.O. box; a false name ("RJITSCT, LLC"); has no presence in the United States; and is "a foreign entity owned by somebody called Reginald Jennings," and Jones "does not know who that is or where he lives, but this is not, you know, a brick-and-mortar US company. This is a mailbox." [*Id.* at 14:4–:21.] Jones presented no evidence to support these assertions. [*See id.* at 15:2–:3 ("I think, you know, given time, given a couple

days, we can track down where they actually are ….”), 15:10–:11 (“I'd have to do more research to find out where Reginald Jennings lives ….”).] Jennings, in contrast, had submitted a sworn declaration and testified under oath that he is a U.S. citizen and that his business operates out of Connecticut. [Dkt. 35-1; Dkt. 66 at 30:13–32:6.]

Next, Beck raised the issues of Expeditee's state of organization and where its principal place of business is. [Dkt. 66 at 19:5–:12.] In response, Jones asserted that Expeditee's principal place of business was 125 South Clark Street, Chicago. [*Id.* at 20:1–:2.] Beck pointed out that Jones's law firm is located at that address. [*Id.* at 21:4–:10.] Jones admitted, “Yeah, to the extent that they are in the US, yes, that's their address,” but “[t]heir base is in Hanoi, Vietnam,” and Expeditee “[p]resently” has no employees who work out of 125 South Clark Street. [*Id.* at 21:14–:22.] Jones still contended that 125 South Clark Street was Expeditee's principal place of business, however, because “that's where we registered their IP. So they have those assets there, and we also help them with their bank accounts. So their US assets are based in Chicago, Illinois.” [*Id.* at 21:25–22:3.][3] Beck pointed out that these assertions were not true, since Expeditee's trademark is registered in Nevada. [*Id.* at 22:4–:7.]

The Court did not enter a preliminary injunction on January 18; instead, it left the TRO in place and set another hearing for January 20, 2022. [*Id.* at 44:8–45:24.]

---

[3]    PMJ now claims that Jones's assertion that Expeditee's principal place of business was in Chicago was based on the location of its U.S. agent, 900 South Clark Street. [Dkt. 97 at 8.] Jones did not mention this address at the hearing.

### E.    Additional Proceedings

On January 20, 2022, the Court dissolved the TRO and denied Expeditee's motion for preliminary injunction as to Respect the Look. [Dkt. 52, 55.] It extended the TRO as to the other Defendants so Expeditee could provide additional evidence about which Defendants used the FLAGWIX mark. [Dkt. 55.] On February 15, 2022, the Court later entered a preliminary injunction as to those Defendants. [Dkt. 77.]

On February 14, 2022, Respect the Look moved to dismiss, for summary judgment, and for attorney's fees. [Dkt. 70.] It renewed its motion for sanctions pursuant to the Court's inherent authority on March 7, 2022. [Dkt. 78.] Expeditee, now represented by new counsel, purported to respond to both of Respect the Look's motions, but its memorandum only argued that sanctions were not warranted. [Dkt. 98.] Expeditee also moved to amend its complaint on March 22, 2022. [Dkt. 88.] Its proposed amended complaint dropped the trademark infringement claim against Respect the Look, added trade dress infringement to its 15 U.S.C. § 1125(a) claim, and added a copyright infringement claim, 15 U.S.C. § 501. [Dkt. 89-2.] Respect the Look opposed this motion. [Dkt. 96.] The Court ordered PMJ to remain in the case so it could respond to the motion for sanctions against it [Dkt. 80], and PMJ separately opposed Respect the Look's motion for sanctions [Dkt. 97].

For the reasons discussed below, the Court finds that Expeditee, its former counsel, or both have engaged in serious misconduct in pursuing claims against Respect the Look and that dismissal of Expeditee's claims against Respect the Look is necessary. Thus, the Court addresses the substance only of Respect the Look's motion for sanctions and Expeditee's and PMJ's responses to it.

## II.    Legal Standard

Rule 11 of the Federal Rules of Civil Procedure provides the ordinary means to sanction litigation misconduct outside of discovery. *Cf.* Fed. R. Civ. P. 37 (discovery sanctions). When submitting a paper to a court, Rule 11(b) requires an attorney to

> certif[y] that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> …
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery ….

The Rule has an important safe harbor provision, Rule 11(c)(2), which requires a party seeking Rule 11 sanctions to first serve a copy of the motion on the opposing party. A motion for Rule 11 sanctions cannot be filed with the court if the opposing party withdraws or corrects the allegedly sanctionable filing. Fed. R. Civ. P. 11(c)(2). Failing to follow the safe harbor procedure precludes a court from imposing Rule 11 sanctions unless a party "'complie[s] substantially' with Rule 11(c)." *McGreal v. Village of Orland Park*, 928 F.3d 556, 558–59 (7th Cir. 2019) (quoting *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 808 (7th Cir. 2003)).

Rule 11 is not the Court's only source of authority to impose sanctions, however. Federal district courts have the inherent power to sanction litigants and attorneys. *Sanders v. Melvin*, 25 F.4th 475, 481 (7th Cir. 2022). Courts can invoke their inherent powers "even if procedural rules"—such as Rule 11—"exist which

sanction the same conduct." *United States v. Rogers Cartage Co.*, 794 F.3d 854, 863 (7th Cir. 2015) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991)). But this inherent power, "because of [its] very potency, must be exercised with restraint and discretion." *Sanders*, 25 F.4th at 481 (cleaned up) (quoting *Chambers*, 505 U.S. at 44). One aspect of the requisite restraint and discretion is to rely on inherent powers only when sanctions under the Rules would be inadequate. *Rogers Cartage*, 794 F.3d at 863. Further, "when the court chooses to exercise its inherent power, it should explain why Rule 11 was inadequate to serve its purposes." *Id.* (cleaned up). This explanation must include "factual findings that adequately support any use of [its] inherent sanctioning powers." *Greyer v. Ill. Dep't of Corr.*, 933 F.3d 871, 877 (7th Cir. 2019).

## III.   Analysis

Respect the Look moves for sanctions pursuant only to the Court's inherent powers [Dkt. 78 at 1], but the conduct it argues is sanctionable is also prohibited by Rule 11 [*see, e.g.*, Dkt. 79 at 13–14 (arguing why Expeditee's conduct violates Rule 11)]. Therefore, the Court must assess whether Rule 11 sanctions would be adequate for its purposes; if not, then sanctioning Expeditee or its counsel under the Court's inherent powers would be inappropriate. *See Rogers Cartage*, 794 F.3d at 863. The Court begins by explaining why Rule 11's procedures are inadequate or inapplicable, then addresses why sanctions are warranted, and finally considers the specific sanctions Respect the Look seeks.

### A.   Adequacy of Rule 11

As detailed above, Expeditee's original complaint, its TRO memorandum, and its January 10, 2022 certificate of service all contain false, erroneous, or legally

14

frivolous statements and arguments. Neither Expeditee nor PMJ addresses the adequacy of Rule 11 directly, but both argue it would be improper to impose sanctions under the Court's inherent power because the Rule 11 procedures were not followed. [Dkt. 97 at 5; Dkt. 98 at 6–7.] The Court disagrees. The preliminary posture under which the sanctionable conduct occurred prevented strict compliance with Rule 11 before the Court entered the TRO and held the preliminary injunction hearing. Allowing Expeditee or Jones to benefit from Rule 11's safe harbor after the fact would fail to "punish[ ] a party's dishonesty and deter[ ] others who might consider similar misconduct." *Sanders*, 25 F.4th at 482 (internal quotation omitted).

The Seventh Circuit has explained that "in many cases involving a request for preliminary relief, blind adherence to the procedures in Rule 11 is not possible. Events often move too fast to allow strict compliance with the rule." *Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 927 (7th Cir. 2004). This observation applies here. When Expeditee sought and obtained the TRO, Respect the Look was not a party and could not have been on notice of the litigation because the relevant filings were sealed. It would have been impossible for Respect the Look to give Expeditee "three weeks to decide whether to withdraw the supposedly offending pleading [and motion]," which is the purpose of Rule 11's safe harbor. *Nisenbaum*, 333 F.3d at 808. Withdrawing its false allegations and frivolous arguments after the fact would do nothing to punish Expeditee for its misconduct or remedy the harm it inflicted on Respect the Look. *See Sanders*, 25 F.4th at 482 (amending a complaint "does not cure any lie made to obtain IFP status"); *cf. Methode*, 371 F.3d at 927–28 (noting the harm

15

caused by defending a TRO request on an emergency basis). If Rule 11 permits Expeditee a consequence-free do-over, then the Rule is inadequate in these circumstances. *Rogers Cartage*, 794 F.3d at 863. [*Contra* Dkt. 97 at 5 (arguing that sanctions are unwarranted because Jones "had a good faith basis for all of the allegations set forth in the Complaint, and promptly corrected any errors").]

The preliminary injunction proceedings present a different question because Respect the Look entered an appearance before the January 18 hearing. *Methode* establishes that, given its appearance just four days before the hearing, Respect the Look was not required to serve a sanctions motion on Expeditee and wait 21 days to file it with the Court. 371 F.3d at 927 (sending a Rule 11 letter two days before a TRO hearing was "what [the defendants] could [do] to comply with Rule 11"). But Expeditee argues that *Methode* does not help Respect the Look because it "filed its first sanctions motion … just *two days* after it had notified" Jones of the problems with service, and he filed an amended certificate of service two days later. [Dkt. 98 at 6.] To the extent that the amended certificate of service remedied the problems with the earlier certificate of service,[4] the Court agrees that sanctions based on errors in the certificate of service would be unwarranted. Jones's quick correction would have, in effect, heeded Respect the Look's warning. *Cf. Methode*, 371 F.3d at 927.

The Court is unpersuaded, however, that Jones's action or the timing of Respect the Look's motion impacts the other grounds for sanctions. Just as in

---

[4]     The Court addresses this issue below.

*Methode*, despite the content of Respect the Look's sanctions motion [*see* Dkt. 35], at the hearing, Expeditee stood by its allegations about its state of organization and its principal place of business, Respect the Look being based in a foreign country, and the validity of its trademark infringement claims, *see Methode*, 371 F.3d at 927 ("When Methode proceeded with the hearing, it, in effect, rejected the warning."). It does not matter that Respect the Look's warning came in the form of a sanctions motion filed with the Court (improper under Rule 11's procedures), as opposed to a letter, email, or demand. *See McGreal*, 928 F.3d at 559; *Nisenbaum*, 333 F.3d at 808. Indeed, filing a motion with the court seeking attorney's fees for pursuing frivolous arguments is sufficient notice to seek sanctions later, even when that motion does not explicitly mention sanctions or follow Rule 11's safe harbor procedure. *Rogers Cartage*, 794 F.3d at 863. The point of the substantial compliance rule is to "alert[ ]" the other party "to the problem" with its filing, *Nisenbaum*, 333 F.3d at 808, which the initial sanctions motion did. Expeditee chose to disregard Respect the Look's arguments and stay the course at the preliminary injunction hearing. It cannot now complain it was not on notice of the arguments and allegations Respect the Look believed to be sanctionable. *See Methode*, 371 F.3d at 927.[5] The Court finds that

---

[5]     The emergency posture of the litigation and Jones's failure to respond to Beck's email regarding service for over 24 hours [*see* Dkt. 35-7 ¶¶ 13–14] put Respect the Look in a difficult position on January 14. What's more, given that Respect the Look was not properly served until after it entered its appearance and moved for sanctions, it is very likely that without Beck's quick work, Expeditee would have received no warning of its misconduct before the preliminary injunction hearing. That is, Respect the Look gave Expeditee as much chance as possible to withdraw its sanctionable statements. In such a fast-moving situation, the Court finds that it would be inappropriate to penalize Respect the Look for any procedural missteps, given the misconduct and improper service.

Respect the Look substantially complied with Rule 11 or, in the alternative, if Respect the Look did not substantially comply, then Rule 11 is inadequate in these circumstances. *Rogers Cartage*, 794 F.3d at 863.

Two further arguments warrant a word. First, Expeditee argues that Respect the Look "had months to serve Expeditee with a draft of" its renewed sanctions motion, and "[t]here is no pending TRO or PI preventing [it] from complying with the 21-day safe harbor requirement." [Dkt. 98 at 6.] This argument fails because once Expeditee stayed the course at the preliminary injunction hearing, it had "rejected the warning," and no further warning was necessary. *Methode*, 371 F.3d at 927; *Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025–27 (7th Cir. 2000) (holding that where an earlier motion for sanctions was denied as premature, it was unnecessary to serve a second motion on the opposing party before filing it with the court). For the same reasons, Expeditee is mistaken that Respect the Look's motion is untimely or moot because it has not had a chance to amend its complaint. [Dkt. 98 at 11 (arguing that it has corrected its misstatements).] The Court already relied on the false statements in granting the TRO, so it is now too late to withdraw them without consequence.

Second, Expeditee argues that the fact that Respect the Look has moved for summary judgment should not impact whether sanctions are appropriate or whether it should be allowed to amend its complaint. [Dkt. 98 at 6–7.] The Court agrees. *Cowen v. Bank United of Texas, FSB* explained that moving to amend a complaint at the summary judgment stage can prejudice a defendant, but there, discovery had been completed, 70 F.3d 937, 944 (7th Cir. 1995); here, however, it has barely begun,

and no formal discovery has occurred. The Court disagrees that moving for summary judgment is a nefarious move on Respect the Look's part. [*See* Dkt. 98 at 6.] Respect the Look submitted evidence in support of summary judgment that would have been improper to rely on in a motion to dismiss. *Dowding v. Nationwide Mut. Ins. Co.*, 490 F. Supp. 3d 1291, 1295 (N.D. Ill. 2020).[6] In any event, as explained above, Respect the Look's sanctions motion is proper regardless of the summary judgment posture.

In sum, the Court finds that applying the Rule 11 procedures would be inadequate to punish and deter misconduct with respect to the representations and arguments made in support of the TRO. *See Sanders*, 25 F.4th at 482. With respect to representations and arguments made in support of the preliminary injunction, the Court finds that Respect the Look's initial motion for sanctions put Expeditee and PMJ on notice of the bases for sanctions, substantially complying with Rule 11 under the emergency circumstances, and Expeditee and PMJ rejected that warning to the extent they did not change their position at the hearing. *See Methode*, 371 F.3d at 927. Respect the Look was not required to serve its subsequent sanctions motion on

---

[6]     Expeditee claims that Respect the Look "admitted during the recent status conference that it intentionally filed the Motion … for the purpose of preventing Expeditee from amending or withdrawing any of its claims …." [Dkt. 98 at 6.] Expeditee fails to cite the record for this assertion, any status conference Expeditee refers to was held before this case was transferred from Judge Wood, and the Court sees no support for Expeditee's assertion on the docket. In any event, even if Respect the Look's motive was to prevent Expeditee from withdrawing its claims or assertions, it would not indicate bad faith. Acquiescing to any withdrawal or correction might be construed as waiver of those claims or assertions as a basis for sanctions, and Respect the Look has pursued sanctions under the Court's inherent power since the day it appeared in this litigation.

Expeditee and PMJ before filing it with the court because the earlier motion put them on notice. *See Divane*, 200 F.3d at 1025–27.

Finally, the Court does not understand Seventh Circuit precedent to limit its ability to impose sanctions under its inherent powers when Rule 11 has been substantially, but not formally, complied with. *See Methode*, 371 F.3d at 927–28 (noting that the defendants "did what they could to comply with Rule 11" but affirming sanctions imposed under inherent powers). The Court proceeds to analyze whether sanctions are proper under its inherent authority, but to the extent it is mistaken, and it must impose sanctions under Rule 11, it would impose the same sanctions under that authority for the reasons described below. *See Roger Cartage*, 794 F.3d at 862–63 (affirming imposition of sanctions on Rule 11 grounds when imposing sanctions on other grounds was an abuse of discretion).

### B.    Sanctionable Conduct

Respect the Look argues that sanctioning Expeditee and PMJ is warranted under the Court's inherent powers. [Dkt. 79 at 15–16.] The Court agrees. Two purposes of sanctions pursuant to the inherent power are "punishing a party's dishonesty and deterring others who might consider similar misconduct." *Sanders*, 25 F.4th at 482 (internal quotation omitted). Committing fraud on the court and pursuing arguments in bad faith are sanctionable misconduct. *Id.* at 481; *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018). To sanction a party for fraud on the court requires a finding of intentional and material misrepresentations or omissions. *Greyer*, 933 F.3d at 877–78. Sanctions for bad faith require "a finding of bad faith, designed to obstruct the judicial process, or a violation of a court order.

Mere clumsy lawyering is not enough." *Fuery*, 900 F.3d at 463–64 (internal quotation omitted). But "[b]ad faith can be recklessly making a frivolous claim …." *Egan v. Pineda*, 808 F.3d 1180, 1180 (7th Cir. 2015) (cleaned up). Additionally, while the Court is imposing sanctions pursuant to Rule 11 only in the alternative, the Seventh Circuit has indicated that it can be appropriate to sanction violations of Rule 11 under the Court's inherent authority. *See Methode*, 371 F.3d at 925–28.

At key points in this litigation, Expeditee, Jones, or both have committed fraud on the court and acted in bad faith. Further, Jones violated Rule 11 by making false factual representations and frivolous legal arguments. The Court considers each sanctionable action in turn.

### 1. False Representations About Expeditee

Expeditee misrepresented information about itself three times in its initial complaint: (1) its name was "Xped LLC," (2) it was organized under Nevada law, and (3) its principal place of business was Chicago. [Dkt. 1 ¶ 1.] While all three misrepresentations are deeply troubling, only the third sanctionable.

*Expeditee's Identity*: Expeditee filed its complaint under the name "Xped LLC," a pseudonym it used to bring the case anonymously. [Dkt. 77; Dkt. 97 at 2.] But it did not request the Court's permission to proceed anonymously or identify "Xped" as a pseudonym in its complaint [Dkt. 1], even though "the complaint must name all the parties," Fed. R. Civ. P. 10(a); *Roe v. Dettelbach*, 59 F.4th 255, 259 (7th Cir. 2023). Anonymous litigation is disfavored; only "in narrow circumstances" is it "possible to overcome the presumption that parties' identities are public information, and the possible prejudice to the opposing party from concealment." *Dettelbach*, 59 F.4th at

21

259 (cleaned up). This Court has an "independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts." *Id.* at 260 (internal quotation omitted).

PMJ defends the use of a pseudonym in the complaint in part on the ground that this practice "is not uncommon" in Schedule A cases. [Dkt. 97 at 7.] True, but this is no answer. The Federal Rules of Civil Procedure apply to Schedule A cases, like any other civil litigation. Many Schedule A plaintiffs proceed under their actual names, and motions seeking permission to proceed under a pseudonym are regularly sought where a party believes pseudonymity is justified. A plaintiff wishing to proceed anonymously must establish that its case involves exceptional circumstances warranting that treatment. *Dettelbach*, 59 F.4th at 259–60; *XYZ Corp. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2020 WL 6681360, at *1 (N.D. Ill. Nov. 12, 2020) ("No-name litigation is the rare exception, not the Rule.") Failing to do so may deprive the public of access to our open courts and interferes with the Court's ability to discharge its duty to determine whether anonymous litigation is appropriate.

The Court does not find Expeditee's use of a pseudonym to be sanctionable, however, because it appears not to have been an attempt to deceive. As Expeditee and PMJ observe, Expeditee disclosed its true identity on its civil cover sheet [Dkt. 3], and its trademark registration also bore its real name [Dkt. 2-1]; both documents were filed the same day as the complaint [Dkt. 97 at 2; Dkt. 98 at 11]. The Court concludes that Expeditee's failure to follow the proper procedure was not intentional

22

fraud, *Greyer*, 933 F.3d at 877–78, and was merely clumsy lawyering, not bad faith to obstruct the judicial process, *Fuery*, 900 F.3d at 463–64. Still, the Court finds the failure to follow proper procedure troubling, and it admonishes Expeditee and Jones not to use fictitious names in filings without disclosing that fact and requesting permission to proceed anonymously.

*State of Organization*: Expeditee also represented that it was a Nevada LLC [Dkt. 1 ¶ 1], when in fact it is a Delaware LLC, as clarified on Expeditee's corrected corporate disclosure [Dkt. 53]. PMJ states that Jones relied on Expeditee's trademark registration, which lists Expeditee as a Nevada LLC with a Nevada address. [Dkt. 2-1; *see* Dkt. 97 at 7–8.] As to Jones, the Court is largely satisfied with this explanation. It would have been better practice to confirm its client's state of registration, but the Court cannot say Jones failed to conduct "an inquiry reasonable under the circumstances," Fed. R. Civ. P. 11(b), by relying on the trademark registration.

The Court is less satisfied, however, with Expeditee's claimed ignorance about this error and its representation that it "does not know where the Nevada address came from." [Dkt. 98 at 6 n.5.] Its trademark was registered on February 9, 2021 [Dkt. 2-1], just 15 months before it filed its opposition to Respect the Look's motion for sanctions on May 19, 2022 [Dkt. 98], yet Expeditee claims to have no knowledge of how the error could have occurred. Given Expeditee's other misconduct in this case, including its deception about its principal place of business, the Court is skeptical. The propriety of Expeditee's trademark registration is not at issue here, though, and

the Court finds that misrepresenting Expeditee as a Nevada LLC was not sanctionable conduct by Expeditee or Jones.

*Principal Place of Business*: Despite having its principal place of business in Vietnam [Dkt. 53], Expeditee falsely represented its principal place of business as Chicago, in the judicial district in which it filed its complaint [Dkt. 1 ¶ 1]. This false statement was sanctionable both as fraud on the court and as bad faith designed to obstruct the judicial process. *Greyer*, 933 F.3d at 877–78; *Fuery*, 900 F.3d at 463–64.

The Court addresses fraud first, which requires an intentional and material false statement. *Greyer*, 933 F.3d at 877–78. By signing the complaint, Jones certified that the "factual contention[ ]" that Expeditee's principal place of business was Chicago "ha[d] evidentiary support." Fed. R. Civ. P. 11(b)(3). But Jones knew Expeditee's principal place of business was in Vietnam, as he admitted at the preliminary injunction hearing [Dkt. 66 at 21:18–:19 ("[Expeditee's] base is in Hanoi, Vietnam.")] and as PMJ admitted in its opposition to the motion for sanctions [Dkt. 97 at 1 ("The Plaintiff is a Vietnam-based company.")]. In fact, Jones knew his client was based overseas before filing the complaint, as evidenced by PMJ's assertion that Expeditee's being based in Vietnam "on occasion, caused communication problems due to the time zone difference between Vietnam and Chicago and a significant language barrier, which the Plaintiff and [Jones] did their best to manage." [*Id.*] Despite this knowledge, Jones misrepresented his client's principal place of business in the complaint, and he doubled down at the preliminary injunction hearing by falsely claiming that Expeditee was based at his law firm's address and had its assets

24

located in Chicago [Dkt. 66 at 19–22]. He did so despite knowing that Expeditee had

no employees in Chicago but "maybe 12" employees in Vietnam. [*Id.* at 21–22.]

PMJ insists that any misrepresentation was not intentional, but it fails to offer

a credible explanation for how Jones could have been honestly mistaken about

Expeditee's home base. [*See* Dkt. 97 at 8.] It suggests that his allegation was actually

based on the location of Expeditee's U.S. agent, at 900 South Clark Street, in Chicago

[*id.*], but this contention harms, not helps, Jones. It is wholly incredible that Jones

could have believed in good faith that Expeditee's principal place of business was in

Chicago via the location of its U.S. agent, but still represent at the hearing that its

home base was his law firm. Moreover, even if Jones somehow held this implausible

belief, it would be based on a frivolous legal argument because *Hertz Corp. v. Friend*

establishes "that the phrase 'principal place of business' refers to the place where the

corporation's high level officers direct, control, and coordinate the corporation's

activities," also known as its "nerve center." 559 U.S. 77, 80–81 (2010) (citations

omitted).[7] Earnestly believing in a frivolous legal argument is no defense to sanctions.

*McGreal*, 928 F.3d at 560 ("Rule 11 requires counsel to study the law before

---

[7]     Complicating matters, Jones seems to have conflated the test for citizenship of a
corporation, "every State and foreign state by which it has been incorporated and of the State
or foreign state where it has its principal place of business," 28 U.S.C. § 1332(c)(1), with the
definition of citizenship of an LLC, which is a citizen of all states and foreign countries of
which its members are citizens, *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998).
Because subject-matter jurisdiction is based on a federal question, 28 U.S.C. § 1331, not
diversity of citizenship, this imprecision does not impact the Court's jurisdiction, but it might
affect what Jones understood "principal place of business" to mean. Ordinarily, that phrase
is a term of art referring to a corporation's citizenship, and the Court finds that Jones invoked
that meaning when he used the term in his complaint and in the hearing.

representing its contents to a federal court. An empty head but a pure heart is no defense." (internal quotation omitted)). If Jones believed that Expeditee could have a principal place of business outside of Vietnam given what he knew about where it conducted business, then that position was legally frivolous under *Hertz* and just as sanctionable as an intentional factual misrepresentation.

The misrepresentation was also material. "Materiality is a context-specific inquiry, but under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Greyer*, 933 F.3d at 879 (cleaned up). Expeditee's misrepresentation about its principal place of business made receiving a TRO (and later a preliminary injunction) more likely for two reasons. First, it gave the Court false confidence that venue was proper in this district. Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). A Chicago-headquartered plaintiff would be more likely to satisfy this provision than a foreign-based one. Making plausible venue allegations matters because the Court would be less inclined to enter an *ex parte* TRO if venue was likely improper than if venue appeared secure. *Cf. Methode*, 371 F.3d at 925 (noting that the district court would not have granted a TRO if venue were improper); *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, 2020 WL 3960451, at *6–7 (N.D. Ill. July 13, 2020) (analyzing venue in an order granting a contested TRO motion). The fact that Expeditee did not expressly rely on its false allegations in support of venue in its

complaint does not change things; the Court might have required Expeditee to put on evidence showing venue was proper before granting the TRO if Expeditee had told the truth. [*Contra* Dkt. 97 at 8.]

Second, a major part of Expeditee's argument for emergency relief including an asset freeze was that Defendants based overseas would abscond with funds if Expeditee proceeded along the normal path of litigation. A TRO is an extraordinary remedy that require a clear showing that the movant is entitled to it. *See USA-Halal*, 402 F. Supp. 3d at 433 & n.5 (citations omitted). Expeditee portrayed itself as an American company, rather than admitting it was based in Vietnam. Many of the Defendants are based in Vietnam too [Dkt. 97 at 13], and if Expeditee had told the truth, the Court might have questioned why a Vietnamese company needed an American court to freeze the assets of Vietnamese Defendants.

The Court finds that Jones's false representations on behalf of Expeditee were both intentional and material. He therefore committed fraud on the Court, and sanctions are warranted pursuant to the Court's inherent powers. *See Greyer*, 933 F.3d at 877–78.

For similar reasons, Jones's false representations were also made in bad faith to obstruct the judicial process. *See Fuery*, 900 F.3d at 463–64. Even if, as Jones claims, he did not intentionally misrepresent the location of Expeditee's principal place of business, he was at least reckless in his initial and continued representations that Expeditee was based in Chicago. *Cf. Egan*, 808 F.3d at 1180 (explaining that bad faith can include recklessly making a frivolous claim). Because the Seventh Circuit

has not articulated a precise definition of recklessness in the context of sanctions under the Court's inherent authority, *see Grochocinski v. Mayer Brown Rowe & Maw LLP*, 719 F.3d 785, 799 (7th Cir. 2013), the Court follows its definition for sanctions under 28 U.S.C. § 1927, which permits sanctions for objectively reckless conduct, *see 4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 913 (7th Cir. 2019) ("Objective bad faith consists of reckless indifference to the law: pursuing a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." (cleaned up)). Applying that definition of recklessness to the factual assertions here, the Court finds that a reasonably careful attorney in Jones's position would have known that his client's principal place of business had to be where its employees were located and could not have been at his *own law firm's* office. Further, Jones's bad faith obstructed the judicial process by preventing the Court from deciding whether to enter a TRO based on accurate information concerning venue and whether freezing the Defendants' assets was warranted. A reasonably careful attorney would have known that his misrepresentations could influence the Court in this manner. Therefore, the Court finds that Jones's misrepresentation about Expeditee's principal place of business is sanctionable under the Court's inherent power because it was in bad faith. *See Fuery*, 900 F.3d at 463–64.

Expeditee also bears responsibility for its counsel's misconduct. "[I]t is well established that attorneys' actions are imputed to their clients, even when those actions cause substantial harm. A litigant bears the risk of errors made by his chosen agent." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020) (cleaned

28

up). The Court finds that it is appropriate to sanction Expeditee for misrepresenting its principal place of business under the Court's inherent power.

### 2. False Representations About Respect the Look

Expeditee falsely claimed that Respect the Look is a foreign company with no meaningful ties to the United States with no evidentiary support or reasonable grounds to believe evidence would support those facts, in violation of Rule 11(b)(3). As the Court has explained, Rule 11's sanctions are inadequate here, so the Court imposes sanctions for those violations pursuant to its inherent powers. *See Methode*, 371 F.3d at 925–28 (affirming sanctions pursuant to the district court's inherent power for conduct that violated Rule 11).

Expeditee's complaint and TRO request do not expressly state that Respect the Look in particular is a foreign company. But by alleging that Defendants including Respect the Look were likely to move assets overseas if the Court did not enter an *ex parte* TRO freezing their assets, Expeditee alleged Respect the Look was based overseas because the risk of flight only applies to persons and entities with little or no U.S. presence. [*See* Dkt. 1 ¶¶ 2, 30; Dkt. 11 at 25; Dkt. 13 ¶ 3.] Respect the Look entered an appearance, opposed the preliminary injunction, and provided evidence that it was a Connecticut-based company whose owner was an American citizen. [*See, e.g.*, Dkt. 35-1 ¶ 2.] Respect the Look's registration lists a Connecticut business address. [*Id.*] Its website provides a Connecticut mailing address, an email address, and an American phone number. [*Id.* ¶ 4.] Respect the Look provided this evidence on January 14, 2022, but rather than abandon his baseless factual claims—heeding the warning, as suggested by *Methode*, 371 F.3d at 927—Jones continued to insist

that Respect the Look was a foreign company [*see, e.g.*, Dkt. 66 at 14:2–:3 ("They have no basis in the United States."), 14:18–:21 ("They have no presence in the United States. They're a foreign entity owned by somebody called Reginald Jennings. I don't know who that is or where he lives, but this is not, you know, a brick-and-mortar US company. This is a mailbox.")]. Jones's only evidence in support of his assertion was that Respect the Look used a P.O. box as its mailing address. [*See id.* at 14–15.][8]

Further, no reasonable pre-suit investigation could have led Jones to believe that Respect the Look was a foreign company. As Respect the Look argues, it is not reasonable to base allegations on "a stereotype: 'that all these companies are overseas and they all use PO boxes.'" [Dkt. 79 at 9 (quoting Dkt. 66 at 24:6–:9); *see* Dkt. 66 at 25:10–:14 ("99 percent of these companies … [are] selling knockoffs of the same image, the same flag, as our plaintiff, and 99 percent of these defendants are overseas companies.").] A reasonable investigation would have, at minimum, checked whether Respect the Look had a U.S. business presence, and such an investigation would have revealed it does. The mere use of a P.O. box—even if consistent with regular foreign

---

[8]      In its opposition to the motion for sanctions, Expeditee notes that Respect the Look's Facebook page indicates "it was managed, at least in part, ***from the Philippines***." [Dkt. 98 at 11 (emphasis in original).] Expeditee represents this as evidence about the adequacy of its pre-suit investigation, but its current counsel did not represent it when it filed its complaint or appeared at the preliminary injunction hearing. Jones made no mention of Respect the Look's Facebook page at the hearing [*see* Dkt. 66], and PMJ does not discuss it in its opposition [*see* Dkt. 97]. The Court therefore finds that the Facebook page's management location is not relevant evidence of the adequacy of Expeditee's pre-suit investigation. Even if it were relevant, the Court would not credit it as evidence of a reasonable pre-suit investigation. The page indicates it is managed from the Philippines and the United States, and in any event, the provenance of the Facebook page does not impact the other evidence that Respect the Look is an American company, discussed above. [*Cf.* Dkt. 98 (noting that many foreign companies use P.O. boxes but failing to discuss any of the other evidence).]

company practice—cannot overcome Respect the Look's U.S. phone number, U.S. business address, and registration to do business in Connecticut. [Dkt. 35-1 ¶¶ 2, 4.] Jones and those who reported to him failed to conduct a reasonable investigation that would have revealed the clear evidence of Respect the Look's U.S. presence.

Jones argues that less diligence is required when there are numerous defendants and when the plaintiff needs to move quickly to secure relief. [Dkt. 97 at 11 (citing *Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988); *Zenith Elecs. Corp. v. Exzec, Inc.*, 1997 WL 798907 (N.D. Ill. Dec. 24, 1997)).] This argument is a non-starter. The cases Jones cites did not involve preliminary injunctive relief, which "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (internal quotation omitted); *see USA-Halal*, 402 F. Supp. 3d at 433 n.5. And here, Expeditee sought and obtained *ex parte* injunctive relief, for which the Court relied on its representations without the benefit of the normal adversarial process. These circumstances do not permit relaxing the standards for pre-suit investigation—if anything, they require the opposite. If a plaintiff seeks extraordinary relief with respect to many defendants, it should expect to put in a corresponding amount of effort. Expeditee emphasizes that it needed to act fast to protect its profits during the period "leading up to Christmas, the most profitable season for Plaintiff" [Dkt. 97 at 11], but it ignores that its TRO harmed Respect the Look's business during its busy season [Dkt. 35-1 ¶ 8 (discussing Respect the Look's lost revenue)].

31

The Court finds that Jones violated Rule 11(b)(3) by representing that Respect the Look was a foreign company with little or no U.S. presence and failing to retract his baseless claims in the face of clear evidence to the contrary. Because Rule 11's sanctions procedure is inadequate to address this misconduct, the Court finds it necessary to sanction Jones and Expeditee under its inherent power. *See Rogers Cartage*, 794 F.3d at 863; *Hinterberger*, 966 F.3d at 529.

### 3. Frivolous Legal Arguments

Jones also advanced frivolous legal arguments about Defendants who were not infringing its FLAGWIX mark, including Respect the Look, in violation of Rule 11(b)(2) (requiring that a lawyer's "claims, defenses, and other legal contentions [be] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"). The Court finds that sanctions are appropriate for bringing these frivolous legal claims.

Expeditee's memoranda in support of its motions for TRO and preliminary injunction relied exclusively on trademark infringement as the basis for receiving relief. [Dkt. 11 at 15–20; Dkt. 27 at 3–4 ("By virtue of this Court's entry of the TRO, the above requirements for entry of a preliminary injunction have been satisfied. The record establishes that through their illegal operations, Defendants have infringed upon Plaintiff's federally registered trademark. Thus, plaintiff is entitled to preliminary injunctive relief.").] Statutory text and binding caselaw make clear that trademark infringement claim requires the "use … of a registered mark." 15 U.S.C. § 1114(1)(a); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) ("The holder of a registered mark … has a civil action against anyone

*employing an imitation of it* ….” (emphasis added)); *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019) (same). But Respect the Look, among many other Defendants, never used the FLAGWIX mark, as Jones admitted. [Dkt. 66 at 9:25–10:3 (“Respect the Look is one of the most sophisticated infringers in this case and one of the most widespread. *They Photoshop out the FLAGWIX logo* on their images.” (emphasis added)), 12:15–:19 (“I think the number is about 50 percent of [Defendants] did not remove the FLAGWIX logo, 50 percent of them did. The more sophisticated counterfeiters like [Respect the Look], you know, they *know better than to show the FLAGWIX trademark* ….” (emphasis added).] Indeed, Expeditee has never produced evidence that Respect the Look used the FLAGWIX mark or demonstrated any reasonable basis for believing it did, making any trademark infringement claim against Respect the Look frivolous.

Jones cannot avoid sanctions through ignorance of this aspect of trademark law; lawyers must research the law before advancing a legal theory in court. *McGreal*, 928 F.3d at 560. Nor are any of Expeditee’s or PMJ’s arguments about why sanctions are not warranted convincing. PMJ suggests that Respect the Look cropped out FLAGWIX’s mark in the image it presented to the Court [Dkt. 97 at 3], but the Court finds this suggestion implausible. Both Respect the Look and Jones included identical flag images in briefing before this Court, which show an entire flag, not one that has been cropped. [Dkt. 35 at 6; Dkt. 40 at 3.] If Jones possessed an image of a Respect the Look flag bearing the FLAGWIX mark, he should have produced it.

PMJ's attempt to rely on Jones's pre-suit investigation fares no better. It indicates the investigation showed that "the defendants had 'cloned' the Plaintiff's products" and "were pawning off counterfeit goods as their own," but on their face, these assertions say nothing about Respect the Look's use of the FLAGWIX mark. [*See* Dkt. 97 at 12.] PMJ suggests that Respect the Look's physical flags bear the mark, even if the pictures online do not. [*Id.* ("It is a common practice for trademark infringers to erase the mark from the picture of the infringing product to avoid liability.").] PMJ represents that it would have been cost prohibitive to purchase flags from each of the alleged infringers before filing suit and suggests that this cost-benefit analysis makes Jones's pre-suit investigation reasonable. [*Id.*] This is a non-sequitur. The fact that it might have been prohibitively expensive to obtain evidence by purchasing flags doesn't get Expeditee any closer to having evidence that Respect the Look (or other Defendants who did not use the mark) infringed its trademark. A plaintiff bears the burden of clearly establishing that it is entitled to preliminary injunctive relief. *Goodman*, 430 F.3d at 437; *see USA-Halal*, 402 F. Supp. 3d at 433 n.5. A plaintiff in Expeditee's position who wishes to obtain an extraordinary remedy does not have a license to fail to develop an evidentiary record or to pursue frivolous legal arguments.

PMJ and Expeditee also contend that Respect the Look violated Expeditee's intellectual property by counterfeiting similar versions of its products, even if it did not use the FLAGWIX mark. [Dkt. 97 at 12 ("Plaintiff and PMJ had a good faith basis to allege that these images were advertisements for the sale of counterfeits of the

Plaintiff's products in violation of its intellectual property rights."); Dkt. 98 at 14 ("Expeditee has ample evidence that RTL willfully infringed Expeditee's valuable intellectual property rights.").] Whether or not this is true,[9] it wasn't the claim Expeditee pursued at the TRO and preliminary injunction stages [*contra* Dkt. 98 at 8 (discussing Expeditee's other claims)], and it has provided no authority or argument as to why it had a nonfrivolous basis to assert trademark infringement claims.[10]

Expeditee's sole basis for receiving a TRO and a preliminary injunction was the Defendants' infringement of its FLAGWIX trademark. But these claims were frivolous as to Respect the Look and the roughly 50% of other Defendants who did not advertise using the mark. By representing otherwise in filings submitted to the Court, Jones violated Rule 11(b)(2). Rule 11's procedures are inadequate to sanction this misconduct, so the Court will impose sanctions under its inherent authority. *See*

---

[9] Respect the Look disputes this assertion; it argues that Expeditee is the counterfeiter. [Dkt. 35 at 7; Dkt. 35-1 ¶¶ 15–17.]

[10] PMJ and Expeditee suggest that even if Respect the Look did not visibly use its mark, Respect the Look could be liable for trademark infringement by "including its trademark within metadata to promote and sell counterfeit products." [Dkt. 97 at 1; *see also id.* at 2, 4; Dkt. 98 at 2, 8, 12 (also using the term "metatags").] Although Expeditee's complaint briefly mentions "meta tags" [Dkt. 1 ¶ 29], its memoranda in support of its TRO and preliminary injunction motions do not rely on this theory [Dkt. 11 at 24 (only mentioning "metatags" in a quotation of another court's preliminary injunction); Dkt. 27 (no mention); *see* Dkt. 100 at 2–3 (noting that Expeditee only argued about use of its mark in support of the TRO)]. Tellingly, Jones did not discuss metadata at the preliminary injunction hearing as a basis for the trademark infringement claim. [*See* Dkt. 66.] Expeditee presented no evidence or argument about this theory of trademark infringement in support of its motions for a TRO and preliminary injunction. Whatever its legal merit (which neither PMJ nor Expeditee address in detail), the Court finds that the metadata theory does not show that the legal arguments Jones actually made were "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed R. Civ. P. 11(b)(2).

*Rogers Cartage*, 794 F.3d at 863. Unlike other grounds for sanctions, the Court will not impose monetary sanctions on Expeditee for this conduct because it was represented by counsel. Fed. R. Civ. P. 11(c)(5)(A). [*See* Dkt. 98 at 12.]

### 4. Certificate of Service

Finally, the Court considers the certificates of service. Respect the Look argues that the January 10, 2022 certificate of service Jones filed was fraudulent. [Dkt. 79 at 9–12.] The Court agrees. In that filing, Jones declared, under penalty of perjury, that he had "caused to be served true and accurate copies of the following documents … via email on the Defendants listed on Schedule A …." [Dkt. 28.] In fact, he had asked the platforms to pass along the documents to the Defendants, which they had no obligation to do. [*See* Dkt. 97 at 9; *id.* Ex. A ¶ 16; *id.* Ex. B.] Jones apparently did not ask for the Defendants' email addresses himself or confirm that proper service was effected. [*See id.* at 9.] Nevertheless, he declared that *he* had caused the Defendants to be served. [Dkt. 28.]

This was an intentional misrepresentation, or at least an intentional, misleading omission. *See Greyer*, 933 F.3d at 877–78. Parsing the phrase "caused to be served" might leave room to argue Jones believed he caused service to be effected by making his request of the platforms, albeit a nonbinding one. But the context in which Jones acted makes clear that his representation was intentionally fraudulent. Expeditee's memorandum in support of its TRO motion discussed service of process *by Expeditee* and made no mention that Expeditee or Jones would ask third-party platforms to effect service for it. [Dkt. 11 at 28–31 ("[T]his Court may allow *Plaintiff* to serve the Defendants via email." (emphasis added)).] The Court's order granting

the TRO likewise reflected the understanding that Expeditee would serve process itself: "*Plaintiff* may provide notice of these proceedings to Defendants … *by sending an e-mail* to the e-mail addresses provided for Defendants by third parties hosting their webstore …." [Dkt. 20 at 6 (emphases added).] Although the order references third-party hosts, it is in the context of those third parties providing Expeditee with email addresses, which Expeditee would then use to serve the Defendants. PMJ insists that Jones "clearly [had] no intent … to deceive this Court" and he "believed that the defendants had been served" [Dkt. 97 at 9], but PMJ fails to explain how Jones could have reasonably believed his actions comported with his assertion that Expeditee would serve the Defendants and the Court's direction for it to do just that. The Court finds Jones's failure to disclose the details about how he caused the Defendants to be served suspicious. If, somehow, Jones believed his actions were reasonable, it is odd he was not more specific, such as, "At my direction, [the platforms] caused to be served …." Jones either intentionally misrepresented how service was effected or at least intentionally omitted important details about service.

Jones's misrepresentation or omission was also material. *See Greyer*, 933 F.3d at 877–78. Expeditee needed to notify the Defendants before receiving a preliminary injunction, Fed. R. Civ. P. 65(a)(1), and the TRO could be extended beyond January 18, 2022 only for good cause, Fed. R. Civ. P. 65(b)(2). Being honest about how Jones had attempted to effectuate service might have given the Court pause about granting a preliminary injunction or extending the TRO, as there was a risk that some or all Defendants might not have received proper notice. By portraying service as having

been properly effected, Jones increased the chances of receiving a preliminary injunction and decreased the chances of the Court dissolving the TRO. Because Jones's filing the January 10 certificate of service was an intentional and material false representation or misleading omission, it was fraud on the Court. *Greyer*, 933 F.3d at 877–78.

Acknowledging the problems with the initial certificate of service, PMJ argues that Jones "immediately remedied any uncertainty regarding service" by "re-serv[ing] all PayPal defendants" on January 16, 2022 and filing an amended certificate of service. [Dkt. 97 at 9–10 (emphasis omitted).] As noted above, if Jones's attempt to properly serve the Defendants cured the problems with his initial attempt at service, the Court would find this conduct does not warrant sanctions. The Court, however, finds that Jones's remedial actions did not effectively correct the earlier problems.

The January 16 service did not include notice of the preliminary injunction hearing two days later; instead, it instructed a recipient that "Any answer or other response … should be filed … within twenty-one (21) days after service of this summons upon you." [Dkt. 42-1 at 1; Dkt. 79 at 11.] *See* Fed. R. Civ. P. 65(a)(1) (permitting entry of a preliminary injunction only after notice). As a result, over 100 PayPal and Alibaba Defendants may not have received the requisite notice, which prevented the Court from being able to enter a preliminary injunction at the January 18 hearing. Instead, the Court extended the TRO, further subjecting the Defendants to a dubious *ex parte* injunction of which they may have had insufficient notice. Any harm done by the TRO—which, as noted above, was based on frivolous legal claims

38

as to approximately half the Defendants—was extended due to Jones's failure to effect proper service.

Apart from harm to the Defendants, Jones's submission of a fraudulent certificate of service was also a serious breach of his obligations to the Court, which his subsequent remedial measures cannot undo. In *ex parte* proceedings in particular, the Court has no choice but to rely on the plaintiff's truthfulness. Making fraudulent representations about service is especially grave misconduct. Without proper service, a defendant whose rights have been affected by the Court's order may have difficulty appearing and vindicating those rights. That could well have occurred here, if Respect the Look had not appeared and vigorously defended itself. Despite Jones's remedial efforts, given the high stakes of this type of proceeding, Court finds that sanctions are warranted based on the initial fraud. *See Sanders*, 25 F.4th at 482.

### C.    Sanctions

The Court has detailed Expeditee's and Jones's misconduct. It now considers what sanctions to impose, which it bases on its "interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Id.* (internal quotation omitted). Respect the Look asks the Court to award it reasonable attorney's fees and costs for the costs incurred defending this lawsuit and to dismiss Expeditee's claims against it with prejudice. [Dkt. 79 at 4.] The Court will do so.

### 1.    Attorney's Fees

Respect the Look argues that it is appropriate to require Expeditee and PMJ "to pay the [its] reasonable attorney fees and costs incurred in seeking dissolution of the TRO and opposing the related motion for a preliminary injunction." [Dkt. 79 at

13.] It notes that this Court has awarded attorney's fees incurred while defending an *ex parte* TRO obtained by pleadings that "were not 'well grounded in fact' or made after 'reasonable inquiry'" and an emergency motion that "caused 'needless delay' and unnecessarily 'increased the cost of litigation.'" *Raskin, S.A. v. Datasonic Corp.*, 1986 WL 12598, at *3 (N.D. Ill. Nov. 5, 1986); *see also Methode*, 371 F.3d at 928 (affirming sanctions including attorney's fees after TRO proceeding). [Dkt. 79 at 13–14.] Neither Expeditee nor PMJ discusses *Raskin*, and Expeditee only discusses *Methode* on different grounds addressed above.

The Court finds that awarding attorney's fees is appropriate and necessary to deter future misconduct by parties and their counsel in the future. *See Sanders*, 25 F.4th at 482. Under these circumstances, awarding attorney's fees is critical for deterrence due to the *ex parte* nature of the TRO proceedings and the fast pace of the preliminary injunction proceedings. If plaintiffs or their attorneys commit fraud on the Court or misrepresent the facts to obtain preliminary injunctive relief, it will be difficult to detect and sanction misconduct without the participation of attorneys on the other side. It is necessary to incentivize defendants to do what Respect the Look did here: hire a lawyer, defend its interests on an expedited basis, and bring deception to the Court's attention. Awarding attorney's fees provides this incentive because it makes fighting rather than giving up a more financially viable choice.

The Court is mindful of the fact that "[a]ttorneys' fees that are imposed as a sanction pursuant to a trial court's inherent authority 'may go no further than to redress the wronged party for losses sustained,' and the court 'may not impose an

additional amount as punishment for the sanctioned party's misbehavior.'" *REXA, Inc. v. Chester*, 42 F.4th 652, 673 (7th Cir. 2022) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). The misbehavior here occurred during the TRO and preliminary injunction proceedings, so as Respect the Look suggests [Dkt. 79 at 13], the Court awards attorney's fees and costs to reimburse Respect the Look for fees and costs incurred while litigating those two motions. Further, as Expeditee argues [Dkt. 98 at 12], Rule 11(c)(5)(A) precludes monetary sanctions against a represented party for advancing frivolous legal arguments. The Court agrees that it would be inappropriate to sanction Expeditee for Jones's frivolous legal arguments. But monetary sanctions *can* be imposed on represented parties for other misconduct, *see Methode*, 371 F.3d at 925, and Jones's other misconduct can be imputed to Expeditee, *see Hinterberger*, 966 F.3d at 529. The Court will provide the parties an opportunity to address the proper allocation of the fees and costs ultimately awarded in subsequent briefing.

### 2. Dismissal with Prejudice

Respect the Look also requests the Court dismiss Expeditee's claims against it with prejudice "to punish the plaintiff for the harm done to the legal system." [Dkt. 79 at 16.] Dismissal with prejudice is a "draconian" sanction, *Greyer*, 933 F.3d at 877 (citation omitted), and the Court does not take it lightly. The circumstances here warrant this harsh sanction, both to deter future misbehavior and especially to punish the serious misconduct here. *See Sanders*, 25 F.4th at 482.

The Seventh Circuit has "held that a dismissal with prejudice is an appropriate sanction for lying to the court in order to receive a benefit from it, because no one

needs to be warned not to lie to the judiciary." *Id.* at 481 (internal quotation omitted). Further, dismissal may "be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false." *Id.* (internal quotation omitted). Both circumstances are present here. Despite knowing it was not based in Chicago, Expeditee and Jones falsely represented that it was. They were aware, at the very least, that this representation might cause the Court not to scrutinize venue before granting a TRO. Additionally, Jones declared that he had served the Defendants, when in fact he relied on third parties with no duty to do so and failed to confirm that proper service occurred. And Expeditee secured a TRO and an asset freeze against Respect the Look by falsely claiming it had evidence of trademark infringement, when that claim was frivolous. Dismissal with prejudice is an appropriate sanction for these actions.

No lesser sanction would be appropriate. *See Greyer*, 933 F.3d at 877 (noting that "in all but the most extreme situations courts should consider whether a lesser sanction than dismissal with prejudice would be appropriate" (citation omitted)). Although the Court has awarded attorney's fees and costs to Respect the Look, that sanction compensated that party for losses incurred due to Expeditee's and Jones's sanctionable conduct. The fee award's purpose was primarily deterrence rather than punishment, which is the primary reason the Court imposes the sanction of dismissal. *See Sanders*, 25 F.4th at 482 (noting courts' dual interests). Moreover, a monetary sanction payable to the Court, unless it was very large, would be an inadequate sanction for bringing a case that from the outset has been plagued with false factual

42

allegations and frivolous legal arguments. Rather than try to fashion such a monetary sanction, the Court finds it appropriate to dismiss Expeditee's claims with prejudice. This sanction is especially fitting because Expeditee now attempts to discard its frivolous claims and pursue new claims; allowing it to do so would fail to adequately punish Expeditee's misconduct or deter other potential wrongdoers. The Court finds that the better message to send is that if a party commits fraud on the court, particularly in an *ex parte* proceeding, it does not receive a second chance to bring viable claims.

Expeditee argues that it should be given just this kind of second chance because it may have valid claims that it brought in its initial complaint (Counts II and III) or that it hopes to add in its amended complaint. [Dkt. 98 at 12–13.] The Court disagrees. Expeditee obtained emergency injunctive relief based on a theory it had no evidence for, failed to adequately serve Respect the Look, and stood by those false allegations and frivolous arguments even after Respect the Look and the Court questioned them. The Court will not give it another opportunity to do what it should have done from the outset: bring factually and legally sound claims.

## IV.   Conclusion

For the foregoing reasons, the Court grants Respect the Look's motion for sanctions [Dkt. 78]. Exercising its inherent powers, the Court dismisses Expeditee's claims against Respect the Look with prejudice. It denies Respect the Look's motion to dismiss, for summary judgment, and for attorney's fees as moot. [Dkt. 70.] It also denies Expeditee's motion for leave to amend its complaint as moot as to Respect the Look. [Dkt. 88.]

43

The Court awards Respect the Look reasonable attorney's fees and costs incurred in vacating the TRO and defending the motion for preliminary injunction. To facilitate the award of fees, Respect the Look must provide the Court with an itemization of fees and costs that contains sufficient billing information to determine a proper award, which will ultimately be allocated between Expeditee and its counsel. Until those records are provided, the Court will not opine as to the scope of the fee award. *REXA*, 42 F.4th at 673–74. The Court also requires additional information on Respect the Look's position that because the Court has dismissed Expeditee's claims with prejudice, the Court should award Respect the Look all of its attorney's fees as the prevailing party pursuant to 15 U.S.C. § 1117(a) and, if so, in what amount. [*See* Dkt. 79 at 16 n.1.]

Respect the Look's counterclaim against Expeditee remains pending. [Dkt. 31.] Expeditee has answered [Dkt. 68], but no discovery has occurred [*see* Dkt. 120]. By separate order, the Court will instruct the parties to propose a discovery schedule for this case.

Enter: 21-cv-6237
Date: September 6, 2023

_____
Lindsay C. Jenkins
United States District Judge